W. A. DRAKE, INC., PETITIONER. *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 1278. Promulgated January 15, 1944.

*Alden T. Hill, Esq.*, for the petitioner.
*Gene W. Reardon, Esq.*, for the respondent.

#### OPINION.

MELLOTT, *Judge*: The Commissioner determined a deficiency in income tax of $1.492.82 and in declared value excess profits tax of $495.44 for the fiscal year ended June 30. 1941. The sole question is whether a loss, sustained by petitioner upon the sale of a farm to one of its stockholders. is deductible from gross income or whether section 24 (b) (1) (B), I. R. C., prevents the allowance of the loss as a deduction.

The facts are found to be as stipulated. Summarizing them, petitioner, a Colorado corporation, was organized in 1924 to handle the assets left by W. A. Drake, who had died intestate. It is engaged in the business of farming and feeding. its principal assets being farms located in Larimer and Weld Counties, Colorado. Its returns were filed with the collector of internal revenue at Denver, Colorado.

The total stock issued by petitioner was 4,380 shares. Several sales and purchases of the stock were made. as detailed in the stipulation, between 1924 and October 11, 1940. Petitioner had acquired 1,176 ⅓ shares, all of which were held in its treasury. The remaining 3.203⅔ shares were held by Frank L. Bartels and his relatives on October 11, 1940, as shown in the schedule below. The stock owned

directly or indirectly by Frank L. Bartels within the purview of section 24, I. R. C., is shown in the last column:

| Stockholder | Shares owned | Relationship to Frank L. Bartels | Shares owned directly or indirectly by Frank L. Bartels |
|---|---|---|---|
| C. A. Bartels (estate of) | *51½ | Father | 25¾ |
| Clydia Mae (Bartels) Nelson | 196¼ | Sister | 196¼ |
| Frank L. Bartels | 222¾ | Self | 222¾ |
| Ruth Elizabeth (Bartels) Nye | 222¼ | Sister | 222¼ |
| Nellie Louise (Bartels) Sodomka | 222¼ | Sister | 222¼ |
| Emma A. Drake (estate of) | 2,190 | Grandmother | 730 |
| E. Arthur Drake | 18⅔ | Uncle | |
| Mrs. Ella Zenor | 79 | Mother-in-law | |
| Tota. outstanding stock | 3,203⅔ | | 1,620¼ |

*This includes one share of stock which Bartels had received in 1934 as a "qualifying share."

Petitioner owned 7 farms, all of which were heavily encumbered. "It was impossible for petitioner to obtain a Federal Land Bank Loan * * * [on these farms] because of the corporate organization and yet it was desired to reduce the amount of interest payable * * *." It was deemed advisable "to sell some farms to accomplish this purpose." Appraisals were made and on October 11. 1940. two contracts or agreements were executed by petitioner and Frank L. Bartels, entitled "Agreement for Sale and Purchase of Property." One covered the "Anderson" and the other the "Carlson" farm. The purchase prices were stated to be $43,290 and $23,581.85, respectively, to be paid:

| | Anderson farm | Carlson farm |
|---|---|---|
| Cash in hand | *$10.00 | *$10.00 |
| Assumption of mortgage | $15,208.89 | $6,817.78 |
| 265 shares W. A. Drake Inc | | 16,764.07 |
| 443 shares W A. Drake. Inc | 28,081.11 | |
| Total | 43,290.00 | 23,581.85 |

* The $10 payments do not appear to have been included in the agreed purchase prices

The sale of the Carlson farm resulted in a profit, which was included in petitioner's gross income and is not in issue. The sale of the Anderson farm resulted in a loss of $15,955.60. If it is deductible there are no deficiencies; if not, the deficiencies are as determined by respondent.

Frank L. Bartels, it will be noted, owned but 222¾ shares of petitioner's stock. However, "sometime within a few weeks prior to October 11, 1940" he had obtained from his sisters Clydia Mae and Ruth Elizabeth certificates for more than 177 shares each and delivered them to petitioner with authority to transfer 177 shares from

each certificate to it upon execution of an agreement between him and petitioner for the purchase of the Anderson and Carlson farms. Nellie Louise, Bartels' other sister, had left with petitioner's secretary "for safekeeping, but not endorsed" a certificate for more than 177 shares. The certificate was mailed to her on December 20, 1940, endorsed by her to petitioner, and returned by her to her brother Frank, and 177 shares were delivered by him to petitioner on December 26, 1940. On the same date Bartels delivered to petitioner 177 shares of the stock owned by him. Recapitulating, the agreed 708 shares came from the following persons and were delivered to petitioner on the dates shown:

| From | Shares | Delivered to petitioner |
|---|---|---|
| Clydia Mae | 177 | Prior to October 11, 1940. |
| Ruth Elizabeth | 177 | Prior to October 11, 1940 |
| Nellie Louise | 177 | December 26, 1940 |
| Frank L Bartels | 177 | December 26 1940 |

Warranty deed for the Anderson farm dated December 20, 1940, and acknowledged by petitioner's president on December 24, 1940, was delivered to Frank L. Bartels, grantee, about January 9, 1941, and sent by him "to the Federal Land Bank in order to enable consummation of a Federal Land Bank and Commissioner loan on the property conveyed by the deed." Appropriate transfer of water rights was made on January 10, 1941.

The agreements for the sale and purchase of the farms provided that if the party of the second part (Bartels) should "first make the payments and perform the covenants herein mentioned to be made and performed * * * the party of the first part will thereupon convey" the described property "by good and sufficient deed." * * * "Second party agrees to pay, to the party of the first part, as the purchase price of the property the sum of" [amounts shown above] "on or before January 1, 1941." "Party of the First Part shall pay to the Party of the Second Part 5½% interest on all cash paid on this contract from the date of payment to January 1, 1941. * * * all taxes assessed for the year 1940 and all interest on mortgage to date of settlement * * * [and] shall retain all crops grown during season of 1940." Interest upon deferred payments at the rate of 5 percent per annum from January 1, 1941, until paid was to be paid by party of the second part and he was "entitled to possession of said property" until termination of the contract. In case of his failure "to make any one or more of said payments, or perform any of the covenants agreed to be made and performed" the agreement could "be terminated at the election of the party of the first part, upon giving to the party of the second part thirty days' notice of intention so to do * * * and in case of such election the party of the second part

shall forfeit all payments made and such payments shall be retained by the party of the first part in full satisfaction and liquidation of all damages * * * sustained." Time is stated to be "of the essence of * * * [the] agreement." The covenants and agreements extend to and are binding upon "the heirs. executors, administrators. successors and assigns of the respective parties."

After the exchange and transfer of the stock pursuant to the agreements for the sale and purchase of the two farms petitioner's total outstanding stock was 2,495⅔ shares. 1,884⅓ shares were held in its treasury. The outstanding stock was owned by Frank L. Bartels and his relatives as shown in the schedule below, the stock owned by him, directly or indirectly, within the purview of section 24, I. R. C., being shown in the last column:

| | Shares owned | Relationship to Frank L. Bartels | Shares owned directly or indirectly by Frank L. Bartels |
|---|---|---|---|
| C. A. Bartels (estate of) | *50½ | Father | 25¼ |
| Clydia Mae (Bartels) Nelson | 19½ | Sister | 19½ |
| Frank L. Bartels | 46 | Self | 46 |
| Nellie Louise (Bartels) Sodomka | 46 | Sister | 46 |
| Ruth Elizabeth (Bartels) Nye | 46 | Sister | 46 |
| Emma A. Drake (estate of) | 2,190 | Grandmother | 730 |
| E. Arthur Drake | 18⅞ | Uncle | |
| Mrs. Ella Zenor | 79 | Mother-in-law | |
| Total outstanding stock | 2,495⅔ | | 912¾ |

*The one qualifying share, referred to in the first schedule above. had apparently been divided among C. A. Bartels' four children

Petitioner and respondent both assume that the farms were purchased by Bartels rather than by him and his sisters, as the handling of the stock seems to indicate. Under the applicable statute,[1] i. e., under the "family rule" in subdivisions (b) (2) (B) and (D), the same question arises whether the sisters had sold or given their stock to their brother or whether he is holding the title to the real estate partially in trust for them; for he is to be "considered as owning the stock owned,

[1] SEC. 24. [I. R. C.] ITEMS NOT DEDUCTIBLE.
* * * * * * *
(b) LOSSES FROM SALES OR EXCHANGES OF PROPERTY.—
(1) LOSSES DISALLOWED.—In computing net income no deduction shall in any case be allowed in respect of losses from sales or exchanges of property, directly or indirectly—
* * * * * * *
(B) Except in the case of distributions in liquidation, between an individual and a corporation more than 50 per centum in value of the outstanding stock of which is owned, directly or indirectly. by or for such individual;
* * * * * *
(2) STOCK OWNERSHIP, FAMILY, AND PARTNERSHIP RULE.—For the purposes of determining, in applying paragraph (1), the ownership of stock—
* * * * * *
(B) An individual shall be considered as owning the stock owned, directly or indirectly, by or for his family;
* * * * * *
(D) The family of an individual shall include only his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants * * *.

directly or indirectly," by his sisters, his father, and his grandmother. We therefore assume, without deciding, that the farms were purchased by Bartels.

Petitioner, adopting the postulate that the contracts were mere "Options" to purchase real estate, argues that the section should not be held to be applicable because the sales were not made until all of the stock was delivered, at which time, under its theory, the required stock ownership in Bartels did not exist. It divides the transactions into several parts—first, the payment of $10 earnest money under each contract; second, the transfer of 354 shares of stock; and, finally, the transfer of an additional 354 shares, the assumption of the mortgages, and the execution and delivery of the deeds. Thus it concludes that the sale of the Anderson farm was not actually made until the date the deed was delivered (January 9, 1941), the date the remaining 354 shares were delivered (December 26, 1940), or the date possession was given (January 1, 1941). It seems to espouse the view that the last date is the true one, arguing that this is so since it was the date "the purchaser assumed the obligation of ownership, the payment of taxes * * * [and] the payment of interest on the incumbrances."

In our judgment petitioner's premise and conclusion are both wrong. The stock seems to have had an agreed value of $63.22 per share on the date the agreements were executed. On that basis, when the purchaser delivered 354 shares to petitioner he, in effect, paid it $22,315.36 on his contracts of purchase, or 50 percent of the agreed price, exclusive of the mortgages. Petitioner assumes that the delivery of the stock on October 11, 1940, was absolute and unconditional, that it vested the title to the stock in petitioner, and that it was thereafter the owner of the stock. This is implicit in its argument that "the stock was delivered and became petitioner's property before Petitioner did in fact convey; so that at the time the sale was actually made or obligation to sell was created, Bartels and his family had ceased to be the owner of 50 per cent or more of Petitioner's stock."

Petitioner apparently recognizes the distinction between an option, giving one a right to purchase, at a fixed price and within a limited time but not imposing any obligation to do so (cf. *Lucas* v. *North Texas Lumber Co.*, 281 U. S. 11), and a contract of sale under which mutual and reciprocal obligations are created. i. e., on the part of one to sell and on the part of the other to buy. *Lawler* v. *Commissioner*, 78 Fed. (2d) 567. It points out that the Colorado courts, like the courts of most of the states, hold that the making of a small payment under an option agreement does not vest in the vendee any equitable title to the property. *Hessell* v. *Neal*, 25 Colo. App. 300; 137 Pac. 72; *Stelson* v. *Haigler*, 63 Colo. 200; 165 Pac. 265; *Neal* v. *North Fork Land & Cattle Co.*, 73 Colo. 79; 213 Pac. 334; and *Anderson* v. *E. H.*

*Pihlstrom Investment Co.*, 87 Colo. 441; 288 Pac. 414. Cf. *Newaygo Portland Cement Co.*, 27 B. T. A. 1097; affd., 77 Fed. (2d) 536. But it is equally well settled that a contract of sale, obligating one to sell and the other to purchase for an agreed price, under which a substantial part of the purchase price has been paid, vests in the vendee an equitable title to the property, the legal title retained by the seller being held as security for the unpaid purchase price and his interest being not unlike that of a trustee or mortgagee. *Roy* v. *Commissioner*, 69 Fed. (2d) 786; certiorari denied, 293 U. S. 580. Apparently the courts of Colorado recognize and apply this rule. Cf. *Morath* v. *Perkins*, 278 Pac. 611; *Cullen* v. *Park Club Land Co.*, 67 Colo. 210; 184 Pac. 303. Under it we think it is clear that the sale was made on October 11, 1940, when the contract was signed and one-half of the consideration was paid. But if we are wrong in this conclusion, then we think Bartels and his sisters remained the equitable owners of the stock until the transaction was completed. The stipulation that petitioner should pay interest upon the amount paid under the contract from the date of payment to January 1, 1941, supports this view. Whichever view is taken the result is the same.

We are not impressed by petitioner's argument that the sale of the Anderson farm can be broken up into several parts. The payment of the earnest money, the payment of one-half of the agreed consideration, and the subsequent payment of the other half and the delivery of the deed were all part of one transaction—the sale of the farm. It is an unrealistic approach to the whole question to say that the title to the stock had passed for the purpose of reducing Bartels' ownership below the percentage required by the statute but that the payment of such a substantial amount under the contract had not resulted in a sale of the real estate. The fact is that there was a sale or exchange between Bartels and the corporation at a time when he owned, directly or indirectly, more than 50 percent of petitioner's stock. The loss, therefore, may not be allowed. Nor is it important that as a result of the transaction Bartels' stock ownership became less than 50 percent. The statute makes no such exception, nor can we.

Petitioner argues that, since the sale and the loss were both bona fide and since Bartels had ceased to be the owner of more than 50 percent of its stock after the sale was made, "the design and purpose of the act * * * [would seem to be] not to prevent the deduction of such a loss as resulted from the sale and exchange here involved." In this connection it suggests that the legislative history of the enactment be considered. Such history has been examined, notwithstanding the fact that there seems to be no ambiguity in the statute; but it does not support petitioner's view.

The section was originally enacted in 1934. In H. R. 704, 73d Cong., 2d sess., it was said: "Experience shows that the practice of creating losses through transactions between members of a family and close corporations has been frequently utilized for avoiding income tax. It is believed that the proposed change will operate to close this loophole of tax avoidance." The same language was repeated in S. R. No. 558, 73d Cong., 2d sess. (C. B. 1939-1, Part 2, p. 607); cf. *Higgins* v. *Smith*, 308 U. S. 473. The Congress did not see fit to make any exception even though the sale and the loss may both have been bona fide. Indeed, in the reenactment and amendment of the act in 1937 it appears to have eliminated that as a test, "because the evidence necessary to establish the fact that a sale or exchange was not made in good faith is almost wholly within the knowledge of the person claiming the deduction  *  *  *." S. R. 1242, 75th Cong., 1st sess., and H. R. 1546, 75th Cong., 1st sess. (C. B. 1939-1, Part 2, p. 723.) The "major purpose of" the 1937 bill was said to be "to close loopholes in the revenue laws of which numerous taxpayers have availed themselves." All of the legislation had been recommended by the Joint Committee on Tax Evasion and Avoidance created under joint resolution which became law on June 11, 1937.

We believe that "the design and purpose" of the legislation was to deny the loss under such facts as those presently before us and that the test of *bona fides* of the sale or of the loss can not be applied. As stated in *Lakeside Irrigation Co.*, 41 B. T. A. 892; affd., 128 Fed. (2d) 418; certiorari denied, 317 U. S. 666:

Even though  *  *  *  [the application of the statute] in the instant case may seem harsh in view of the fact that the transaction seems to have been one made for purely business reasons and not to establish a tax loss, we do not feel that we have the power to relieve petitioner from its terms. We must give effect to laws as Congress has written them, and if any changes are to be made Congress must make them.

Petitioner has abandoned the charge made in its petition that respondent erred in failing "to compute as one transaction the capital gain and loss from the sale of the two farms to one purchaser at the same time." See *B. O. Mahaffey*, 1 T. C. 176 (on appeal 8 C. C. A.); *Lakeside Irrigation Co., supra.*

Inasmuch as Bartels owned, directly or indirectly, more than 50 percent in value of petitioner's outstanding stock within the purview of section 24. *supra*, when the sale of the Anderson farm was made, the Commissioner, in our judgment, did not err in denying the claimed deduction.

*Decision will be entered for the respondent.*