MORRIS R. DEWOSKIN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 67348. Filed November 28, 1960.

*William P. Rosenthal, Esq.*, for the petitioner.
*Erving Sodos, Esq.*, for the respondent.

OPINION.

TIETJENS, *Judge:* The respondent determined a deficiency in income tax of $52,158.75 for the taxable year 1953. The issues presented are: (1) Whether the petitioner is entitled to the interest deduction claimed

in 1953; (2) whether if the interest deduction is disallowed the petitioner is entitled to a deduction for net "out-of-pocket" expense incurred in the transaction; (3) whether if the interest deduction is allowed, the petitioner realized taxable income due to the acceptance by Camp Hale Alumni Association of the United States Treasury notes subject to a liability in excess of basis; (4) whether if such taxable income is realized, the petitioner is entitled to eliminate from taxable income reported interest income accrued on the securities; and (5) whether the petitioner is entitled to an increase in the amount of his charitable contribution to Camp Hale Alumni Association.

All of the facts are stipulated, are so found, and are incorporated herein by reference.

It is stipulated that inasmuch as the issue before the Court involves the bona fides, for tax purposes, of the transactions hereinafter related, that the use of the words "buy," "bought," "buyer," "sell," "sold," "seller," "purchase(d)," "purchaser," "borrow(ed)," "borrower," "loan(ed)," "lender," "interest," "note," "debt," and words of this class should not be taken or considered as evidence of the fact that there was, for tax purposes, a bona fide purchase, sale, borrowing, loan, interest payment, or debt, but rather that these aforesaid words are used merely to relate the form of the transactions which gave rise to this proceeding.

Petitioner is an individual with his principal office in Chicago, Illinois. He filed his income tax return for the year 1953 with the director of internal revenue, Chicago, Illinois.

In his 1953 income tax return petitioner reported adjusted gross income of $95,470.54 and net income of $20,907.26. He included interest income of $17,544.21 attributed to "U.S. Treasury Notes" and deducted $37,817.92 of interest expense attributed to "Seaboard Investors Securities." He reported a charitable donation of $753.45 to Camp Hale Alumni Association.

The $17,544.21 of interest income reported by petitioner on his 1953 income tax return was computed as follows:

| | | |
|---|---:|---:|
| Semiannual interest credited to his account | | $13,750.00 |
| Less: | | |
| Interest accrued at date of purchase | 4,334.24 | |
| | | $9,415.76 |
| Interest accrued as of Dec. 30, 1953 | | 8,128.45 |
| Total | | 17,544.21 |

The $37,817.92 of interest expense deducted by petitioner in his 1953 income tax return was computed as follows:

| | |
|---|---:|
| Interest paid by allocation of interest income due him | $9,415.76 |
| Interest paid on Dec. 29, 1953 | 28,402.16 |
| Total | 37,817.92 |

The interest expense deduction, interest income, and charitable contribution reported by the petitioner arose from the following transaction. The form of this transaction was:

On May 11, 1953, petitioner placed an order with Livingstone and Company, hereinafter referred to as Livingstone, to buy $2 million face amount of United States Treasury 1⅜% notes maturing March 15, 1954. Livingstone executed it by placing an order on that same date with C. F. Childs and Company, hereinafter referred to as Childs, Government bond dealers, for delivery to his account at the Guaranty Trust Company of New York, hereinafter referred to as Guaranty.

Also on May 11, 1953, Livingstone sent confirmation of this purchase as petitioner's agent to petitioner and to Childs and the latter confirmed its sale as of May 11, 1953, to Livingstone for the account of petitioner.

The purchase price of the Treasury notes was 99⅘₂, which amounted to a principal sum of $1,982,500, plus accrued interest of $4,334.24, making a total purchase price of $1,986,834.24. Petitioner paid $3,000 in cash by check dated May 14, 1953, to Livingstone's order, and on May 12, 1953, executed a promissory note to the order of Seaboard Investment Associates, Inc., hereinafter referred to as Seaboard, which reads in part as follows:

On March 15, 1954 I promise to pay * * * Seaboard * * * (hereinafter referred to as the obligee) the sum of—

ONE MILLION NINE HUNDRED EIGHTY THREE THOUSAND EIGHT HUNDRED THIRTY-FOUR AND 24/100 DOLLARS

together with interest on unpaid balances at the rate of 2⁹⁄₁₆% per annum, subject to the following rights and conditions, having deposited with the said obligee the following securities as collateral:

$2,000,000 U.S. Treasury 1⅜% Notes of March 15, 1954

The undersigned gives to the obligee a lien against the securities pledged for the amount of the obligations set forth herein, and gives to the obligee the right to hypothecate and use the securities pledged for any purpose while so pledged. Said right is not to be inconsistent in any manner with the ownership by the undersigned of the said collateral, and with the right to the undersigned to obtain the return of the collateral at any time upon tender of payment of the principal and interest due hereunder.

The undersigned shall not be called upon nor be liable to furnish additional collateral to the obligee at any time.

The undersigned may anticipate payment, in whole or in part, at any time, of the amount due hereunder, and shall receive back a pro rated portion of the collateral so held; provided nevertheless that interest at the rate of ¼ of 1% per annum pro rated to the maturity date shall be charged on the amount or amounts so paid by anticipation.

All payments received by the obligee directly from or indirectly for the account of the undersigned shall be applied first to payment of interest and any balance thereof applied to payment of principal due hereunder as the obligor shall elect.

The undersigned shall not in any event be personally liable to pay any of the principal indebtedness hereof or interest arising hereunder (including the penalty interest of ¼ of 1% per annum for prepayment) except from the proceeds from the sale of the said collateral deposited. Application of the proceeds from the sale of the said collateral by the obligee shall be a full accord and satisfaction of any and all claims hereunder and act as a full and complete discharge of any and all liability of the undersigned.

This note has been entered into in the City of Chicago, and shall be construed and interpreted in accordance with the laws of the State of Illinois.

On May 12, 1953, petitioner addressed a letter to Livingstone directing that the Treasury notes be delivered to Seaboard against payment by that company of $1,983,834.24.

Also on May 12, 1953, petitioner addressed a letter to Seaboard directing it to receive the Treasury notes from Livingstone against payment to Livingstone of $1,983,834.24.

Under date of May 11, 1953, Livingstone, by letter, instructed Guaranty to receive the Treasury notes from Childs, account of petitioner, against payment to Childs of $1,986,834.24, and instructed that its (Livingstone's) account be charged in that amount.

Also on May 11, 1953, by letter to Guaranty, Livingstone instructed Guaranty to deliver to Childs, from its (Livingstone's) account, the $2 million face amount of Treasury notes against payment by Childs of $1,986,521.74.

Also on May 11, 1953, Childs confirmed the purchase from Livingstone of $2 million United States Treasury notes 1⅜% due March 15, 1954, for $1,986,521.74.

On May 13, 1953, the Treasury notes were received from Childs by Guaranty, which charged Livingstone's account on its books with the sum of $1,986,834.24 and Guaranty drew a check to Childs for that amount.

The same Treasury notes which had been purchased were redelivered on the same day by Guaranty to Childs against payment by Childs in the amount of $1,986,521.74.

Childs by letter dated May 13, 1953, acknowledged Livingstone's payment of the $1,986,834.24 purchase price.

Petitioner drew a check, dated December 30, 1953, payable to Seaboard's order for $28,402.16, transmitted the check to Livingstone by letter dated December 29, 1953, and received acknowledgment by Livingstone of the receipt of the check by its letter dated December 31, 1953. The letter stated the check was an interest payment.

Seaboard issued a check, dated December 30, 1953, to petitioner's order for $28,500 as proceeds of an additional loan. To evidence his new indebtedness petitioner executed and delivered an additional promissory note to Seaboard on December 30, 1953, in the sum of $28,500. This note was executed upon the same terms and conditions and subject to the same limitation of personal responsibility as the

note of May 12, 1953, the terms of the May 12, 1953, note being incorporated into this note by reference.

On December 30, 1953, petitioner assigned all of his right, title, and interest in the $2 million United States Treasury notes 1⅜% due March 15, 1954, to Camp Hale Alumni Association, subject to an existing lien in the amount of $2,008,000.

Under date of December 31, 1953, Camp Hale Alumni Association advised Livingstone to sell for cash for their account $2 million United States Treasury 1⅜% notes and receive the same from Seaboard against payment to Seaboard of the amount of their lien and advised Seaboard of that fact.

Livingstone confirmed the sale by Camp Hale Alumni Association of the $2 million United States Treasury 1⅜% notes at 100⁵⁄₃₂ and a total selling price of $2,003,125, accrued interest of $8,128.45 and commissions of $2,500 for a realized net sales price of $2,008,753.45.

By letter dated December 31, 1953, Seaboard transmitted its check for $753.45 to Camp Hale Alumni Association.

By its letter of January 6, 1954, to petitioner, Camp Hale Alumni Association acknowledged receipt of $753.45 as petitioner's contribution.

The books of Seaboard contained entries relating to the above-described transaction as follows:

(a) On May 12, 1953, Morris DeWoskin's notes receivable account is debited in the amount of $1,983,834.25 and "L & Co." accounts receivable is credited in the same amount.

(b) On December 28, 1953, cash is debited in the amount of $28,402.16 and interest for the account of Morris DeWoskin is credited in the same amount.

(c) On December 30, 1953, Morris DeWoskin's notes receivable account is debited in the amount of $28,500 and cash is credited in that same amount.

(d) On December 31, 1953, Morris DeWoskin's notes receivable account is credited in the amount of $2,012,334.24, "L & Co." accounts receivable is debited in the amount of $2,008,753.45, "Other" accounts receivable is credited $753.45 and interest for the account of Morris DeWoskin is debited $4,334.24.

The petitioner had no knowledge of, or part in, the sale to Childs of the $2 million United States Treasury notes 1⅜% of March 15, 1953, which had previously been purchased by him through Livingstone, as agent.

The petitioner was advised that sometime after September 15, 1953, Seaboard had credited petitioner's account with the semiannual interest due on the $2 million United States Treasury notes 1⅜% in the amount of $13,750 by applying $4,334.24 against the principal of

petitioner's note and $9,415.76 against the accrued interest on petitioner's note.

The function of Guaranty in the transaction was to clear securities, according to instructions of Livingstone, who had an account with the bank for that purpose. Guaranty received a $100 fee for its clearing services.

Seaboard was incorporated under the laws of Massachusetts on February 2, 1953. Its balance sheet reflects assets and liabilities at the close of its fiscal year ended January 31, 1954, as follows:

ASSETS

| | |
|---|---|
| Cash | $1, 639. 82 |
| Notes and accounts receivable | 178, 181, 721. 98 |
| Accrued interest receivable | 610, 894. 82 |
| Organization expense | 50. 00 |
| Total assets | 178, 794, 306. 62 |

LIABILITIES

| | |
|---|---|
| Accounts payable | 2, 500. 00 |
| Short sales | 179, 031, 977. 04 |
| Capital stock | 500. 00 |
| Surplus (or deficit) | (240, 670. 42) |
| Total liabilities | 178, 794, 306. 62 |

From incorporation, throughout its existence, Seaboard had a nominal cash position. Throughout Seaboard's existence, each loan made by it was made possible only by a security sale consummated by delivery of the same securities deposited with Seaboard as collateral to secure the loan, and which had been purchased in part or in whole with the proceeds of the loan.

The high and low prices of the United States Treasury 1⅜% notes due March 15, 1954, were as follows:

| Week | High | Low | Week | High | Low |
|---|---|---|---|---|---|
| *1953* | | | *1953* | | |
| 2 | 99. 5/32 | 99. 2/32 | 36 | 99. 22/32 | 99. 19/32 |
| 4 | 99. 11/32 | 99. 7/32 | 38 | 99. 28/32 | 99. 23/32 |
| 6 | 99. 13/32 | 99. 10/32 | 40 | 100 | 99. 28/32 |
| 8 | 99. 14/32 | 99. 12/32 | 42 | 100. 3/32 | 99. 31/32 |
| 10 | 99. 16/32 | 99. 12/32 | 44 | 100. 4/32 | 100. 1/32 |
| 12 | 99. 17/32 | 99. 13/32 | 46 | 100. 4/32 | 100. 2/32 |
| 14 | 99. 13/32 | 99. 10/32 | 48 | 100. 3/32 | 100. 1/32 |
| 16 | 99. 12/32 | 99. 9/32 | 50 | 100. 3/32 | 100. 1/32 |
| 18 | 99. 8/32 | 99. 4/32 | 52 | 100. 7/32 | 100. 4/32 |
| 20 | 99. 13/32 | 99. 3/32 | | | |
| 22 | 99. 13/32 | 99. 4/32 | *1954* | | |
| 24 | 99. 15/32 | 99. 13/32 | 2 | 100. 11/32 | 100. 7/32 |
| 26 | 99. 17/32 | 99. 13/32 | 4 | 100. 15/32 | 100. 11/32 |
| 28 | 99. 18/32 | 99. 16/32 | 6 | 100. 15/32 | 100 |
| 30 | 99. 21/32 | 99. 17/32 | 8 | 100. 25/32 | 100. 21/32 |
| 32 | 99. 22/32 | 99. 20/32 | 10 | 100. 24/32 | 100. 21/32 |
| 34 | 99. 24/32 | 99. 21/32 | | | |

The bid and asked prices of United States Treasury notes 1⅞% due March 15, 1954, on the dates below specified, were as follows:

| 1953 | Bid | Asked |
|---|---|---|
| Dec. 29 | 100. 5/32 | 100. 7/32 |
| Dec. 30 | 100. 6/32 | 100. 8/32 |
| Dec. 31 | 100. 7/32 | 100. 9/32 |

Petitioner did not pay any interest on indebtedness to Seaboard in 1953.

Petitioner's contribution to Camp Hale Alumni Association in 1953 was $753.45.

Petitioner had out-of-pocket expenses in 1953 of $2,148.71 in connection with the above transactions.

Except for immaterial variances as to names and amounts the form of the transaction is the same as the case of *Eli D. Goodstein*, 30 T.C. 1178 (1958), affd. 267 F. 2d 127 (C.A. 1, 1959) and our holding in that case that the transaction was a sham is controlling in this proceeding. See also *Sonnabend* v. *Commissioner*, 267 F. 2d 319 (C.A. 1, 1959), affirming a Tax Court Memorandum Opinion, *Lynch* v. *Commissioner*, 273 F. 2d 867 (C.A. 2, 1960), affirming 31 T.C. 990 and *Leslie Julian*, 31 T.C. 998, and the recent Supreme Court case of *Knetsch* v. *United States*, 364 U.S. 361 (1960), where it was held that amounts claimed as interest could not be deducted where the transaction which gave rise to the claimed deduction was a sham. Accordingly, the claimed interest deduction is disallowed.

In view of the holding of the Second Circuit in *Becker* v. *Commissioner*, 277 F. 2d 146 (1960), reversing a Memorandum Opinion of this Court, we deem it necessary to discuss the question of whether the petitioner is entitled to a deduction for net out-of-pocket expense incurred in the transaction, if the interest is disallowed. In *Goodstein*, we held that:

Since the petitioner did not intend to purchase and did not purchase any Treasury notes, it cannot be said that there was a transaction entered into for profit within the meaning of section 23(e) of the Internal Revenue Code of 1939. * * * It is clear that the type of transaction to which the statute refers is one which has substance and in which there is a true motive of deriving a profit. We hold that there is no statutory authority for the allowance of any part of the [out-of-pocket expense] * * * as a deduction.

In *Becker*, a case that dealt with a similar transaction engineered by Livingstone in conjunction with Seaboard, Childs, and Guaranty, the court in deciding this question reversed our holding that such expense was not deductible. The court said:

Becker contends that if the interest deduction is disallowed, he should be permitted to deduct his loss of $8,524.17 under § 23(e)(2) of the 1939 Code permitting the deduction of losses incurred by an individual "in any transaction

entered into for profit, though not connected with the trade or business." The Commissioner answers that the transaction was not "entered into for profit" but solely for the purpose of achieving an interest deduction. Becker denies this, pointing to the almost certain appreciation of the Treasury notes as their maturity approached. We need not pass on this controversy. For the nature of Becker's loss is clearly delineated by § 117(g)(2) of the 1939 Code which prescribes that "gains or losses attributable to the failure to exercise privileges or options to buy or sell property shall be considered as short-term capital gains or losses." * * *

The court concluded that the expense was deductible as a short-term capital loss.

The Court of Appeals in reaching its conclusion in *Becker* relied on intimations in *Goodstein* and *Lynch*. The First Circuit in *Goodstein* said at page 132:

it cannot be denied that this amount was actually expended by the taxpayer in connection with a transaction which, although it did not result in the purchase of Treasury notes or the borrowing of money, did create a bilateral contract * * *

In *Lynch* it was found that there was a contractual right to require the delivery of the Treasury notes upon the repayment of the loan with a further right to anticipate payment under the penalty terms of the contract. In both cases the rights possessed were derived from the mutual obligations of a bilateral contract.

With all due respect for the Court of Appeals, we must point out that "privileges or options" in section 117(g)(2) has reference to rights possessed under a unilateral contract, *Lawler* v. *Commissioner*, 78 F. 2d 567 (C.A. 9, 1935); *W. A. Drake, Inc.*, 3 T.C. 33 (1944), affd. 145 F. 2d 365 (C.A. 10, 1944), and is not applicable to losses that arise from failure to carry out bilateral contracts. Therefore to classify the failure to exercise a right existing under a bilateral contract under section 117(g)(2) is incorrect.

It must also be noted that even if the classification were correct, section 117(g)(2) merely defines what "shall be considered" to be short-term capital losses. After it has been resolved that the transaction fits the definition of section 117(g)(2), its deductibility must be ascertained by reference to section 22(n)(6), which provides in effect that capital losses are deductions from gross income if they are "deductions * * * allowed by section 23 as losses from the sale or exchange of property." The part of section 23 providing for the deduction by an individual of such losses as are described in section 22(n)(6) is section 23(e). In regard to capital losses section 23(e) is limited by section 23(g). The regulations under section 23(g) state:

[Regs. 118] Sec. 39-23(g)-1 *Capital losses.* (a) Section 23(g) provides that deductions allowed to individuals under section 23(e) * * * for losses sustained on the sale or exchange of a capital asset shall be limited to the extent provided in section 117. * * *

It is clear that capital losses are deductible under section 23(e), and only under that section, subject to the further limitation of section 23(g) which incorporates by reference the definitions of section 117.

Therefore, even if the transaction is considered a short-term capital loss under the definition of section 117(g)(2) it is not deductible unless it is a trade or business loss, section 23(e)(1), a loss incurred in any transaction entered into for profit, section 23(e)(2), or a casualty loss, section 23(e)(3).

The expenses were not incurred in a trade or business or as the result of a casualty loss. Therefore, the issue of whether the transaction was entered into for a profit, which the Court of Appeals circumvented in *Becker*, must be resolved if the expense is to be deductible.

Relying on our holding in *Goodstein* that there was "no true motive of deriving a profit" from the transaction, it follows that there is no statutory basis for allowing the deduction for the out-of-pocket expense. *Eli Winkler*, 2 T.C. 735, affd. 143 F. 2d 483 (C.A. 2, 1944).

Issues (3) and (4) are resolved by our foregoing holding that the petitioner is not entitled to the interest deduction claimed.

The final issue relates to the petitioner's contention that he is entitled to deduct as a contribution to charity the fair market value of the property contributed less the liabilities to which the property was subject. This would increase his charitable deduction from $753.45 claimed and allowed, to $3,253.45. In light of our holding following *Goodstein*, that the transaction was a matter of form without substance, this contention has no merit. Camp Hale Alumni Association did not receive securities subject to any liabilities or any other property rights. The $753.45 was not the proceeds from a "sale" of securities, but rather a contribution under the guise of a "sale" to complete the form of the transaction, it being of the same character as the contribution to the Morris Falk Foundation in *Goodstein*.

The respondent concedes that the petitioner should not be charged with income from interest and capital gain on the Treasury notes if respondent's contentions are otherwise upheld.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

OPPER, *J.*, dissenting: An inferior tribunal need not agree with an appellate court in order to be controlled by its rulings. Whether or not an opinion on review is correct seems to me irrelevant.

This would follow, in my view, whether the case before us were to go to the same or a different circuit. Cf. 8 J. Taxation 228 (1958); 7 J. Taxation 172 (1957); 9 Stanford L. Rev. 827 (1957); 7 Duke L. J. 45 (1957); 70 Harv. L. Rev. 1313 (1957); 57 Col. L. Rev. 717

(1957) ; 43 A.B.A.J. 945 (1957). And it would be presumptuous to assume that in the light of the unmistakable constitutional requirement of geographical uniformity, a revenue act would expressly or by possible implication require its unequal and discriminatory administration by the Tax Court according to its precise place of enforcement within our national boundaries.[1] See *Robert M. Dann* (dissent), 30 T.C. 499, 510.

Only where there are conflicting views in the Courts of Appeals do I think the Tax Court, with its nationwide jurisdiction, may be free to choose the rule it will follow. Cf. *Arthur L. Lawrence*, 27 T.C. 713, revd. (C.A. 9) 258 F. 2d 562. But, here, there is only one appellate court opinion passing upon the present issue. If we follow it and are again reversed, a conflict would arise which presumably the Supreme Court or, if necessary, Congress could resolve. If we are affirmed, no problem will exist. In either event, it seems to me that this proceeding is controlled by *Becker* v. *Commissioner*, (C.A. 2) 277 F. 2d 146, whether correct or incorrect, and that that disposes of the question.

---

[1] Cf., e.g., *Poe* v. *Seaborn*, 282 U.S. 101, with *Fernandez* v. *Wiener*, 326 U.S. 340.