JOHN R. HUDSPETH, ET AL., [1] Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent. Hudspeth v. Commissioner
Docket Nos. 5266-70, 5277-70, 5278-70.
United States Tax Court
T.C. Memo 1972-253; 1972 Tax Ct. Memo LEXIS 4; 31 T.C.M. (CCH) 1254; T.C.M. (RIA) 72253; December 26, 1972, Filed *4 Held: Petitioners are not entitled to deduct as interest amounts purportedly paid to their parents as part of purchase-money mortgages on property transferred to them by their parents. There was no bona fide indebtedness upon which interest was due. Isidore Feldman, for the petitioners. Joseph M. Wetzel, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiencies in income taxes of the petitioners for the year 1966 in the following amounts: Docket No.
Petitioner
Deficiency
5266-70
John R. Hudspeth
$ 796.00
5277-70
Roger Hudspeth and
Jamie Hudspeth
1,116.00
5278-70
Ronald J. Hudspeth and
Jane Hudspeth
1,596.00
*5 At trial the cases were consolidated on joint motion of the parties. The sole issue to be decided is whether petitioners are entitled to interest deductions under section 163(a), I.R.C. 1954, [2] as a result of payments purportedly made by them to their parents for certain tracts of land transferred to them by their parents on May 14, 1965. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. All of the petitioners in these consolidated cases were residents of Prineville, Ore., at the time they filed their petitions herein. Each filed a return for the calendar year 1966, either jointly or individually, with the director of internal revenue for the district of Oregon, reporting income on a cash basis. John Hudspeth, Sr., and Floreine Hudspeth (sometimes hereinafter referred to as John and Floreine) are the parents of petitioners Roger, Ronald, and John, Jr. During the year in issue, Ronald and Roger were married to Jane Hudspeth and Jamie Hudspeth, respectively. [3]
*6 For many years prior to 1965, John Hudspeth was engaged in successful sawmill and lumber operations. In 1954 he began acquiring large tracts of land for cattle-raising purposes and subsequently he became involved in a large cattle operation which utilized over a million acres of ranch land in central Oregon. The cattle operations, however, never were successful. Prior to 1965, John and Floreine owned a large ranch located near the Crooked River outside of Prineville, Ore. The ranch did business under the name Golden Pine Ranches and was engaged in cattle raising and growing cattle feed. A substantial portion of the acreage which constituted the ranch was irrigable land. The land in the Crooked River Valley around Prineville is dry, and irrigation is necessary to grow the feed crops needed to maintain the local cattle operations. To enable the farmers to obtain the water needed for their crops the Bureau of Reclamation, a division of the United States Department of the Interior, maintains a dam on the Crooked River for irrigation purposes. All of the farmers in the surrounding area have the right to purchase some of the water collected in the reservoir, but they are subject to *7 some restrictions. Under Federal law, a person is limited to ownership of 160 acres of land actually irrigated by the Bureau reservoir, but a husband and wife may own up to 320 acres of irrigated land. Under attribution rules, a person is also charged with a portion of irrigated land owned by a corporation in the ratio that his stock ownership bears to the total outstanding stock in the corporation. However, there are no attribution rules which apply to the members of a family. Where a person owns excess land to be irrigated by the Bureau reservoir, he may bring himself into compliance with the acreage limitations by disposing of the excess lands, through sale or gift, to whomever he pleases for whatever price he can negotiate. If there is no disposition of the excess holdings, the Bureau may appraise the land and require it to be sold. If the land is not then sold under the Bureau's appraisal, no irrigation waters from the Federal project may be used on the land. Because the Golden Pine Ranch contained approximately 1,509 acres of irrigable land, the Bureau informed John that he would have to dispose of his excess acreage. John then conferred with his attorney and a tax specialist *8 to determine how he should dispose of his excess holdings. He considered making a gift of the excess land to his children, but both his cattle business and his lumber operations were in a decline and he did not have sufficient liquidity to pay the substantial gift taxes that would be generated. Therefore, it was determined that a sale of the land would be the best way to dispose of it. Subsequently, John's attorney devised a plan under which John would deed three tracts of his ranch land to his three children, and their wives, and in return they would sign a nonnegotiable note and mortgage on the land, and also lease it back to him. [4] The plan also provided a means for each of the three children, Ronald, Roger, and John, Jr., to pay off his note. John and Floreine intended for petitioners to receive annual rent for their use of the land and a yearly cash gift from them which would cover the annual payment on each petitioner's obligation. The plan was implemented in May 1958, at which time each of the three children received a package of instruments *9 in the mail from their father's attorney. The package contained a deed, a mortgage, a lease, and a letter from John explaining the arrangement he was offering to them and their wives. None of the children or their wives had prior knowledge of the arrangement, there were no negotiations concerning the proposed transaction, and John's attorney represented all of the parties to the transactions. The letters explained that the accompanying deeds conveyed approximately 320 acres of irrigated land to the two married children and their wives and 160 acres to John, Jr., the unmarried son. The letters also explained that each conveyance was contingent upon two conditions. First, petitioners had to execute the accompanying purchase-money mortgage and note and return it to John and Floreine. Secondly, they had to execute the accompanying lease and also return it to their parents. The letters also provided: It is our plan and intention to pay you the $3,000.00 rental each year for the first eight years and to also make a gift to you of the sum of $12,000.00 each year. You will, therefore, have a total of $15,000.00 that you can then use to pay your mortgage against this property. To off-set *10 against the income you will receive on this rental, you should be able to depreciate a certain amount of the property so that there will be little or no tax to you. [5]
The deeds executed on May 14, 1965, and sent to petitioners conveyed the following tracts to them: Number Grantee(s)
[6] of Acres Roger and Jamie
446.48
Ronald and Jane
388.23
John R., Jr.
385.99 The deeds themselves contain no conditions precedent to conveyance of the tracts. The instruments which constituted the purchase-money mortgages and the nonnegotiable notes were also dated May 14, 1965. These documents provided, among other things, that the two married sons and their wives would owe $96,000 on their newly acquired land and John Jr., would owe $48,000. Annual payments were to be made on the debt, Ronald and Roger paying $15,000 and John, Jr., paying $7,500, and such payments included 6 percent *11 interest on the unpaid balance. The instrument further provided that upon the death of either John or Floreine, the balance due on each note will be canceled as liquidated damages for termination of the lease. The leases sent to petitioners for their execution as lessors were also dated May 14, 1965. Under the terms of the contracts the three plots concerned were to be leased to John and Floreine for a period of 12 years at a total rental of $72,000. The annual rent was to be $3,000 for the first 8 years of the lease and $12,000 for the last 4 years. [7] There was an option for the lessees to renew the lease for an additional 5 years at a rental of $12,000 per year. [8] The leases also contained a clause which provided upon the death of etgher John for Floreine the contract would be canceled and the surviving parent would pay a sum equal to the balance due on the mortgage as liquidated damages for termination of the lease. John and Floreine also were granted first refusal to purchase the property in the event that any of the petitioners decided to sell their land during the term of the lease. *12 Petitioners executed the mortgages and leases as they were instructed and returned them to John's attorney. Thereafter, the documents were recorded with the proper county authorities. On May 24, 1965, John was considered to have met the Bureau's conditions necessary to irrigate his land. The books and records of Golden Pine Ranches contain entries which indicate that John and Floreine received partial payments from their children with regard to their annual mortgage installments on May 14, 1966. Roger and Jamie were credited with a $3,000 payment ($1,029 in principal and $1,971 in interest); Ronald and Jane were credited with a $3,000 payment ($1,029 in principal and $1,971 in interest); and John, Jr., was credited with a payment of $1,500 ($514.50 in principal and $985.50 in interest). None of petitioners' bank account statements indicates that the payments were made. [9]
On December 27, 1966, John and Floreine drew checks of $12,000 to Ronald and Jane and to Roger and Jamie. They also drew a check for $6,000 *13 to John, Jr. The three checks were deposited in the personal bank accounts of the payees. On December 27, 1966, Ronald and Jane issued a $12,000 check to John and Floreine to satisfy the remainder of their 1966 mortgage installment. The following day, Roger and Jamie issued their check for $12,000 and John, Jr., issued his check for $6,000 to John and Floreine to satisfy the remainder of their 1966 mortgage installments. With respect to each of the two $12,000 payments, John and Floreine allocated $8,753.59 to principal and $3,246.41 to interest. With respect to the $6,000 payment, they allocated $4,376.79 to principal and $1,623.21 to interest. At the time the three mortgage installment checks were drawn, Ronald, Roger, and John, Jr., had balances in their bank accounts of $2,441.02, $160.35, and $0, respectively, and they assumed that their parents had drawn checks in their favor in corresponding amounts. On May 31, 1967, Ronald and Jane published a personal balance sheet which listed, among other assets and liabilities, the tract of land conveyed to them on May 14, 1965, valued at $96,000 and the outstanding mortgage on the land of $76,568.30. The balance sheet was composed *14 for purposes of establishing petitioners' borrowing capacity. On November 30, 1970, Roger and Jamie were divorced. Petitioners entered into a property settlement on August 26, 1970, in which Roger promised to pay Jamie $27,000 for her one-half interest in the ranch land deeded to them on May 14, 1965. On February 22, 1971, John, Jr., borrowed $51,300 from the Federal Land Bank of Spokane. The collateral for the loan was the property deeded to him on May 14, 1965. At the time of the loan transaction John, Jr., still owed $16,180.84 on his parents' purchase-money mortgage. Since his father refused to subordinate the mortgage to the Federal Land Bank obligation, John, Jr., was forced to liquidate his parent's mortgage on the land with a prepayment of $11,301.27 in order to consummate the loan. By an amended 1965 income tax return, filed on December 15, 1967, John and Floreine reported the May 14, 1965, land transactions with petitioners as sales, producing a $140,215 profit. Additionally, on their 1965 return John and Floreine reported his $26,162 salary and an ordinary loss of $534,572 experienced in their business operations for that year. On their 1966 income tax return John *15 and Floreine reported interest income received from petitioners as follows: Mortgagors
Interest
Ronald and Jane Hudspeth
$5,217
Roger and Jamie Hudspeth
5,217
John R. Hudspeth, Jr.
2,609 They also reported an ordinary loss of $453,150 from their business operations during that year. During their 1966 tax year Ronald, Roger, and John, Jr., reported incomes of $30,300, $12,000 and $12,000, respectively, earned as salaries and wages. In addition, Ronald and Roger each reported $3,000 and John, Jr., reported $1,500 in rental income. However, from those amounts Ronald and Roger each deducted $5,217 and John, Jr., deducted $2,609 as interest expenses. Accordingly, each reported a loss on the operation of his tract of Golden Pine Ranch land: Ronald and Jane, $2,217; Roger and Jamie, $2,217; and John, Jr., $1,109. In his notices of deficiency to petitioners, respondent determined that they were not entitled to the interest deductions claimed with respect to payments on the mortgages held by John and Floreine Hudspeth. Respondent's determination was based on his finding that each deduction was "not attributable to a bona fide indebtedness." In an amended answer *16 filed with this Court on May 25, 1971, respondent further alleged that the amounts claimed by petitioners as interest deductions were "not in fact 'paid/ within the meaning of section 163(a) of the 1954 Code." OPINION At the outset, we must dispose of a procedural issue raised by petitioners at trial and on brief concerning respondent's amended answer. Petitioners contend that the additional argument raised by respondent in his amended answer constitutes "new matter" within the meaning of Rule 32, Tax Court Rules of Practice, and, therefore, he bears the burden of proof with regard thereto. Several cases were cited by petitioners in support of their contention, but after careful study we have found that none substantiates their position. The notices of deficiency sent to the petitioners disallowed the interest deductions taken by them on their 1966 income tax returns because the deductions were not "attributable to a bona fide indebtedness." Respondent's amended answer additionally alleged that each deduction was "not allowable because such amount claimed was not in fact 'paid' within the meaning of section 163(a) of the 1954 Code." In our opinion the supplementary argument proffered *17 for the first time in respondent's amended answer does not constitute "new matter." In a number of prior cases we have held that a new position taken by respondent is not necessarily a "new matter," particularly where the new position merely clarifies or develops the original determination without being inconsistent with it or increasing the amount of the deficiency. Rozelle McSpadden, 50 T.C. 478 (1968); Benjamin Braunstein, 36 T.C. 22 (1961), affd. 305 F. 2d 949 (C.A. 2, 1962), affd. 374 U.S. 65 (1963); C. D. Spangler, 32 T.C. 782 (1959); Leland D. Payne, 30 T.C. 1044 (1958), affd. 268 F. 2d 617 (C.A. 5, 1959); Arthur Sorin, 29 T.C. 959 (1958), affirmed per curiam 271 F. 2d 741 (C.A. 2, 1959). In this case the notices of deficiency made it reasonably clear that respondent determined that the amounts claimed were not deductible under section 163(a). Cf. Benjamin Braunstein, supra.The new argument in respondent's amended answer invokes the same code section, is consistent with his original determination, and does not affect the amount of deficiency *18 at issue. Moreover, respondent's supplementary argument simply questions one of the elemental facts that petitioners must establish to overcome his original determination. Accordingly, petitioners retain the burden of proof on all facts at issue. The primary issue here before us concerns the deductibility of alleged interest payments made by petitioners to John and Floreine Hudspeth with respect to an intrafamily sale of ranch land. Respondent contends that petitioners were participants in a staged sale of the ranch land from their parents to them which was undertaken principally for tax avoidance purposes. Respondent asserts that the sales and attendant mortgages were not bona fide and thus petitioners are not entitled to interest expense deductions for their alleged installment payments made thereon, the requital of which, he argues, never occurred. Upon this issue, petitioners argue that the transactions were bona fide and did create a legally valid indebtedness, the installments of which included deductible interest expenses. Petitioners contend that the transactions were predicated upon a valid business reason separate and distinct from any tax avoidance motives; that the *19 terms of the contracts were fair; that the subsequent obligations arising therefrom were substantively real and enforceable; and that as a result of the sales, they acquired both the legal and equitable rights to the concerned tracts. Petitioners further allege that the questioned mortgage payments were made in full. We have carefully weighed the evidence in the record and conclude that respondent's position is well taken. Without delving at length in the detail that brought us to our conclusion we note the following facts: (1) John and Floreine originally intended to make gifts of the tracts to petitioners and changed their minds only when they realized the amount of gift taxes involved; (2) from a practical standpoint, in 1966 petitioners did not have sufficient means of their own to make the annual installments due on the mortgages; (3) at the time of the sales John and Floreine indicated their intentions to make annual gifts to petitioners to enable them to make the mortgage payments; (4) the sales arrangement offered to petitioners was unexpected and nonnegotiable; (5) it is doubtful under the circumstances attending the transactions as outlined in the letters John sent to petitioners *20 explaining those transactions that petitioners' obligations to make the mortgage payments would have been enforceable if John and Floreine had not made the annual gifts referred to in the letters; (6) any unpaid balances on the mortgages at the time of death of either John or Floreine would be canceled in the guise of liquidated damages for termination of the leases; (7) John and Floreine never lost control over the land as a result of the sale, but utilized it as part of their farm under 12-year leases which were required incidentals to the sales. While none of these facts alone is enough to give respondent's position absolute credence, the implications arising from the series of facts are adequate to convince us that petitioners were not parties to bona fide sales and that the amounts claimed as interest deductions were not paid on bona fide indebtedness. In a situation such as this it is often necessary to consider the entire transaction from afar, weighing circumstantial evidence and logical inferences as well as direct evidence to ascertain its basic purpose. Cf. United States v. Cumberland Public Service Co., 338 U.S. 451 (1950). The record clearly establishes *21 that John and Floreine had a valid and pressing business reason for their disposition of the excess irrigated acreage of Golden Pine Ranches, i.e., to comply with the mandate of the Bureau of Reclamation. It also discloses their legitimate desire to keep the land under family control so that it would be of future benefit to their children and grandchildren. Plainly it was these concerns which originally prompted their disposition of the tracts to petitioners. Equally certain is the principle that a taxpayer may plan his personal business affairs so as to avoid unnecessary or excessive taxation. Knetsch v. United States, 364 U.S. 361 (1960); gregory v. Helvering, 293 U.S. 465 (1935); Peter Pan Seafoods, Inc. v. United States, 417 F. 2d 670 (C.A. 9, 1969); Estelle Morris Trusts, 51 T.C. 20 (1968), affirmed per curiam 427 F. 2d 1361 (C.A. 9, 1970); Charles E. Curry, 43 T.C. 667 (1965). In this instance, however, that legal principle is not applicable to the facts. It is undisputable that John and Floreine were entitled to convey their land to petitioners, either by sale or gift, and that they were entitled *22 to make the transfers in whatever manner they deemed most economical, taking into consideration the minimization of taxes. But they cannot gild what were intended as gifts with the appearance of sales and expect to have the various ingredients of sales recognized for tax purposes just because of the form in which the transactions were cast. We think the evidence and the economics of the circumstances bear out our conclusion that John and Floreine intended to make gifts of the land to their children in installments in order to take advantage of the annual gift tax exclusions provided under section 2503(b), and that the form in which the transactions were cast did not give birth to bona fide indebtedness from the children to the parents, which is the basis of the only issue we have before us. Section 163(a) allows a deduction for "all interest paid or accrued within the taxable year on indebtedness." The term interest on indebtedness has been defined as meaning "compensation for the use or forebearance of money," Deputy v. DuPont, 308 U.S. 488 (1940), and "the amount which one has contracted to pay for the use of borrowed money," Old Colony R. Co. v. Commissioner, 284 *23 u.s. 552 (1932). Under the transactions here involved petitioners had no use of borrowed money, and their parents were not deprived of the use of money or property because the only money involved was given to the petitioners by their parents and immediately returned to the parents, and the parents retained possession and full use of the property involved. None of the petitioners made his 1966 mortgage payments, including the interest here in controversy, from any funds other than the rental income and cash gifts from John and Floreine, and the evidence all indicates that that was intended to be the sole source for payment of the mortgage installments. In fact, there is no evidence in the record which indicates that petitioners were in a financial position to meet the mortgage payments, from their own income at least, had the funds not been given or paid to them by their parents. The evidence indicates that petitioners did not have the economic means to be seriously considered as purchasers and, had the sellers been anyone other than family members, the transfers would never have occurred. In fact, as heretofore mentioned, it seems highly unlikely that had the parents failed to make *24 the annual gifts the children would have been called upon to make the mortgage payments, in light of the manner in which the transactions were arranged. And finally, in the event either of John or Floreine died before the plan was completed they in effect made a gift of any balances that might be due on the purchase-money mortgages by canceling them as liquidated damages for termination of the leases. In short, John and Floreine, who sought to give their children some of their land, chose to utilize the sale form as a facade to shield the sum and substance of the transaction. Through the ingenuity of their attorney, they used a legal artifice to comply with the rules of the Bureau of Reclamation and, at the same time, to circumvent the gift tax statute. Such devices are contrary to the intendment of the Federal tax laws. Cf. Gregory v. Helvering, supra. Cases stressing substance over form in tax matters are myriad, and their citation is clearly appropriate in this situation. Perry A. Nichols, 37 T.C. 772 (1962), affirmed per curiam 314 F. 2d 337 (C.A. 5, 1963); Morris R. DeWoskin, 35 T.C. 356 (1960); Knetsch v. United States, supra; *25 Gordon MacRae, 34 T.C. 20 (1960), affd. 294 F. 2d 56 (C.A. 9, 1961), certiorari denied 368 U.S. 955 (1962); Egbert J. Miles, 31 T.C. 1001 (1959). In short, we cannot allow interest deductions on debts created by purported sales transactions which were economically unfeasible without the annual gifts and favorable tax impact. Joseph H. Bridges, 39 T.C. 1064 (1963), affd. 325 F. 2d 180 (C.A. 4, 1963). Eli D. Goodstein, 30 T.C. 1178 (1958), affd. 267 F. 2d 127 (C.A. 1, 1959). Petitioners place heavy emphasis on three events they urge show the bona fide nature of the sales: Ronald's publication in 1967 of his mortgage debt and land ownership in a statement drawn up for purposes of establishing borrowing capacity; Roger's 1970 property settlement with his divorced wife Jamie in which he paid her for her share of the equity in the concerned land; and John Jr. 's, $51,300 mortgage on his tract given in 1971, the proceeds of which went partially to pay off his parent's mortgage on the land when they refused to subordinate their mortgage to that of the bank. The short answer to these *26 arguments is that they are of only circumstantial probative value and they are too remote from the date of the transfer to be decisive. Moreover, their existence is not at all inconsistent with respondent's argument that the transfers were in reality gifts. Ronald's publication of the mortgage debt in 1967 only affirmed an illusory right of his parents which he knew, from their actions and statements, never had been or would be enforced. Roger's property settlement with Jamie was aimed primarily at bringing about a peaceful separation, and furthermore, she clearly had some equity in the property, as did Roger, as a result of the annual gifts. John, Jr.'s, 1971 mortgage on his property merely proves he had legal title to the property and had acquired sufficient equity in the property through the annual gifts to pay off his parents' mortgage. The fact that he had to make that payment is merely evidence that having disobeyed his father's wishes he was forced to forego the remainder of his gift installments of the property and buy the remaining equity in the property outright. That does not prove a prior obligation to pay interest. Furthermore, there is no evidence that John and Floreine *27 did not continue to make cash gifts to John, Jr., which he could use to pay off the substituted mortgage to the bank. Since we have determined that petitioners are not entitled to the interest deductions claimed, we see little benefit in discussing respondent's second argument with respect to petitioners' actual payment in full of the 1966 installments, other than to note that the evidence appears to be convincingly in his favor. We, therefore, hold that petitioners are not entitled to the claimed interest deductions. [10]
Decisions will be entered for the respondent. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Roger Hudspeth and Jamie Hudspeth, Docket No. 5277-70; and Ronald J. Hudspeth and Jane Hudspeth, Docket No. 5278-70.↩
2. All section references are to the Internal Revenue Code of 1954, unless otherwise noted.↩
3. Jane Hudspeth and Jamie Hudspeth were passive figures in the sale herein at issue, and accordingly, they are not prominent in the findings of fact. Each filed a 1966 joint return with her spouse.↩
4. John and Floreine also deeded some of their ranch land to their grandchildren, but those conveyances are not herein at issue.↩
5. In the letter to John, Jr., the figures were one-half the amounts stated in the letters to the two married sons, Ronald and Roger.↩
6. All of the transferred ranch land in excess of the acreage limitation imposed by the Bureau of Reclamation was either nonirrigable or unirrigated.↩
7. John, Jr., was to receive a total of $36,000 rent under his lease with payments of $1,500 per year for the first 8 years of the lease and $6,000 per year for the last 4 years of the lease. ↩
8. The rent under the renewal option on John, Jr.'s, land was $6,000 per year.↩
9. Subsequent to the trial petitioners were given 30 days additional time to produce further evidence of the payments. However, no additional evidence was adduced.↩
10. Respondent made no adjustments in petitioners' taxable income with respect to the rental income reported by petitioners on their returns, and petitioners assigned no error with respect thereto. Consequently, we have no issue before us with respect to the rent paid by John and Floreine to petitioners.↩