ERSKINE M. ROSS, DECEASED, BY OSCAR LAWLER AND ROBERT E. ROSS, EXECUTORS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 42593, 55656.   Promulgated October 31, 1933.

*George M. Thompson*, *C.P.A.*, *Charles D. Hamel*, *Esq.*, and *Lee I. Park*, *Esq.*, for the petitioners.

*Alva C. Baird*, *Esq.*, and *Eugene Harpole*, *Esq.*, for the respondent.

234

BLACK: The issues which we have to decide in this proceeding are as follows:

(1) Does the agreement dated February 10, 1923, together with the declaration of trust dated March 22, 1923, detailed in our findings of fact, constitute an installment sale of the 703.2 acres of land described therein or does the agreement, together with the declaration of trust, constitute a mere option to purchase the 703.2 acres in parcels, such option to be exercised from time to time as to separate parcels by the recordation of plats thereof?

(2) Are the provisions of section 44 (d) of the Revenue Act of 1928 constitutional and, if so, do they apply to any balance due on sales made prior to January 1, 1928, that remained unpaid on December 10, 1928, the date of death of Erskine M. Ross?

## Issue No. 1.

Relative to the first issue, the respondent contends that the agreement and declaration of trust was an installment sale of the 703.2 acres, and that the decedent realized taxable income each year to the extent of the percentage of profit recognizable under the regulations applicable to installment sales. Petitioners contend that the agreement and declaration of trust was merely an option to purchase from time to time parcels of the 703.2 acres, granted by the decedent to the Haddock-Nibley Co., referred to as the buyer, and that no sales, installment or otherwise, occurred until the alleged option was exercised by the buyer by platting and recording certain particular parcels thereof. In other words, petitioners contend that instead of there being one installment sale of the entire 703.2 acres, as the respondent contends, there were, during the years in question, four separate sales upon which taxable income was realized, namely, an installment sale in 1923 of 132.253 acres, and two completed sales in 1926 of five acres and 17.591 acres, respectively, and one completed sale of 2 acres in 1927.

In deciding Issue No. 1 we have two lengthy documents to construe. These documents, though executed a few days apart, were parts of the same transaction and must be construed together. In construing the documents, we must take them as a whole and not take mere isolated parts. If we were to judge the transaction by isolated parts of the documents, some of them are so contradictory

that it would be difficult to judge what the parties really did mean to do. But the construction of a written instrument is not to be found in any name which the parties may have given to the instrument and not alone in any particular provisions it contains, disconnected from all others, but in the ruling intention of the parties, gathered from all the language they have used. It is the legal effect of the whole which is to be sought for, not a mere part. *Heryford* v. *Davis*, 102 U.S. 235.

Following this rule of construction, did the documents in question evidence an installment sale of the entire 703.2 acres described therein, or merely give the buyer an option to purchase all or any part of the entire tract under the terms and conditions set forth in great detail in the documents? At this point it is well to note that installment sales may be either where the title completely passes to the buyer at the time of sale, or where it is contemplated that a conveyance is not to be made at the outset, but only after all or a substantial portion of the purchase price has been paid. Art. 44, Regulations 62, 65, 69; art. 352, Regulations 74. Of course a mere option is not a contract of sale and would not be treated as an installment sale under the statute and the Commissioner's applicable regulations.

Whether an agreement is a contract of sale or a mere option is a question that has been often litigated. The test usually applied is whether the agreement under consideration creates a " mutual obligation " on the part of the buyer to buy and the seller to sell. If it does, it is a sale; if it does not, it is an option. See *Stelson* v. *Haigler*, 63 Colo. 200; 165 Pac. 265, wherein the court said:

It may be laid down as an established rule of law that, unless the contract contains language which may reasonably be construed as an agreement on the part of the vendee to purchase the property, or to assume some obligation thereunder, it will be an option contract and not an agreement of sale and purchase. It is impossible to conceive of an agreement of sale and purchase without obligation on the part of the vendee to purchase. On the other hand, the absence of such obligation is the distinctive characteristic of an option contract. A contract of sale creates mutual obligations on the part of the seller to sell, and on the part of the purchaser to buy, while an option gives the right to purchase, within a limited time, without imposing any obligations to purchase. James on Option Contracts, sec. 105, and authorities cited; *Hessell* v. *Neal*, 25 Colo. App. 300, 137 Pac. 72.

See also *Brickell* v. *Atlas Assur. Co.*, 10 Cal. App. 17; 101 Pac. 16, wherein the court sets forth the distinction between the two kinds of contracts as follows:

* * * " The distinction between a contract to purchase or sell real estate and an option to purchase is that the contract to purchase or sell creates a mutual obligation on the one party to sell and on the other to purchase, while an option merely gives the right to purchase within a limited time without imposing any obligation to purchase." 29 Am. & Eng. Ency. of Law (2d Ed.) 608; *Menzel* v. *Primm*, 6 Cal. App. 204, 91 Pac. 756. In other words, an option

is a right "acquired by contract to accept or reject a present offer within a limited or reasonable time in the future." 21 Am. & Eng. Ency. of Law, 924.

Petitioners recognize that the rule is as stated in the two above mentioned decisions, which decisions petitioners cite along with others as supporting the rule, but contend that the buyer in the agreement of February 10, 1923, was not "obligated" to buy any part of the 703.2 acres until a parcel thereof had been platted and maps recorded with the seller's approval, and that therefore the said agreement was nothing more than a mere option to buy. Whether an instrument or instruments constitute a sale or an option "is answered by reading the instruments." *Gutierrez* v. *Graham*, 227 U.S. 181.

A careful reading of the agreement in question impresses us that it was much more than an option. It was a contract of sale of the entire 703.2 acres in which certain optional features were granted to the buyer to plat and subdivide it into separate tracts. Under the agreement the buyer was obligated "to pay with the interest thereon from the date of delivery of deed to the Trust Company" a mortgage of $65,650 which seems to have existed on the entire tract; to make a down payment of $34,350; "to survey and plat said property for subdivision in parcels" subject "to the approval of the Seller"; "to install all street work and utilities * * * at the sole cost and expense of the Buyer"; "to take such steps as may be necessary in the judgment of the Seller by giving bond or otherwise to protect the Seller and the Seller's property from liens of workmen or persons furnishing materials to be used in the construction of such improvements"; to pay the seller within two years after the property had been conveyed to the said trustee "a total payment on account of the principal of not less than" $175,000; to pay the seller in each succeeding year thereafter not less than $175,000 "on the principal of such purchase price, and any and all interest which may accrue * * * until the Seller shall have received in full from the Buyer the total purchase price of One Million Six Hundred Thousand Dollars ($1,600,000.00) and all interest which may have accrued" it being understood, however, that the payment of the mortgage and the $34,350 above mentioned, "may be treated as a balance of the purchase price"; and to pay all taxes, assessments and governmental charges of every kind, except income and inheritance taxes, beginning with the fiscal year 1923–1924.

It will be noted from the language quoted above that the buyer was obligated to pay not less than $175,000 on the principal during the first two years and $175,000 annually thereafter until the contract price was fully paid. There seems to be nothing conditional or contingent about these promised payments. The obligation which they represent is inconsistent with the idea that the contract of sale of February 10, 1923, was a mere option giving the buyer option to

buy whatever parcels of land he should decide to plat but binding him to purchase none. It is true that in none of the taxable years before us did the buyer make a payment as large as that called for by the provisions of the contract. The reason for this is not explained by the stipulation which has been filed. Doubtless it was due to an agreeable arrangement between the buyer and the seller which has not been explained to us, but, be that as it may, there is nothing to show that petitioners' decedent ever regarded the buyer's obligation to pay this $175,000 the first two years and $175,000 annually thereafter as anything other than a straight-out contractual obligation to pay.

It seems to us that this fact is conclusively shown by the letter which decedent wrote to the trustee on November 21, 1927. In this letter decedent called attention to the fact that the buyer would owe payments of $175,000 each on March 23, 1928, March 23, 1929, and March 23, 1930, and that the trustee was authorized, on account of the existing depression, to reduce these payments to $100,000 on each of the above respective dates, "instead of the $175,000 as is specifically required in and by our trust agreement."

Counsel for petitioners in their brief lay a good deal of stress on the fact that it is the duty of the Board to give the written documents a construction which will accord with the interpretation which the parties themselves put upon the documents in their dealings with each other. Certainly the action of decedent in instructing the trustee to require only payments of $100,000 annually for three years instead of annual payments of $175,000 and referring to the $175,000 annual payments as being "specifically required in and by our trust agreement", does not accord with petitioners' contention that the documents in question granted a mere option to purchase.

In *Suburban Imp. Co.* v. *Scott Lumber Co.*, 59 Fed. (2d) 711; certiorari denied, 287 U.S. 660, the court construed a certain agreement to be a sale rather than an option, upon facts somewhat similar to those in the instant proceedings. In that case the complainant was the owner of a suburban real estate development near the city of Wheeling, West Virginia, which it had divided and platted into approximately 100 residential lots. In 1928 it entered into a contract with the defendant whereby it agreed "to sell any one or all" of the lots at prices set forth in the contract "at any time while this contract remains in force." The defendant agreed that it would:

* * * within the calendar year 1928, purchase and pay for a number of said lots, aggregating in price at the least twenty thousand dollars ($20,000.00), and that it will, within each and every calendar year thereafter, during the life of this contract, purchase and pay for a number of said lots aggregating in price at the least twenty thousand dollars ($20,000.00). It is mutually covenanted and agreed that failure or default on the part of the party of the sec-

ond part [the defendant] to comply with the provisions of this paragraph shall cause a forfeiture of its right under this contract.

Paragraph 11 of the contract there involved provided, in part:

It is understood and agreed that this contract constitutes an option, which divests the party of the first part [the complainant] of its right to make sale to any other party of any of the lots included herein, during the life of this contract * * *.

After 1928 the defendant refused to buy and pay for any more lots, contending that its contract with the complainant was nothing more than a mere option under which it was under no obligation to buy. The court held against that contention and upheld complainant's bill. In its opinion the court cited in support of its holding the case of *Berry* v. *Humphreys*, 76 W.Va. 668; 86 S.E. 568, in which it was held:

A contract granting to the party of the second part an exclusive right and option to purchase certain lots of land, and in express terms binding him to pay, in installments, a stipulated amount of purchase money, binding the parties of the first part to sell and convey the lots to him, and giving them an option to annul the unperformed part of the contract, in case of default in payment, and treat the payments as money paid for the option and right of purchase, and retain it, but not specifically extending to the party of the second part any right to withdraw or cease to make payments, is a contract of sale and purchase, not one of mere option to purchase.

Cf. *Jefferson Gas Coal Co.*, 16 B.T.A. 1135; affd., 52 Fed. (2d) 120; *A. B. Watson*, 24 B.T.A. 466; affd., 62 Fed. (2d) 35; *Charles J. Derbes*, 24 B.T.A. 276, and cases there cited; *C. A. Cochran*, 23 B.T.A. 616.

On Issue No. 1 we hold in favor of respondent.

### *Issue No. 2.*

The second issue presents an entirely new question that has never been passed upon by either the Board or the courts—at least we have been cited to no decision construing the section of the statute in question. It is, whether, under section 44 (d) of the Revenue Act of 1928, there should be reported in the final income tax return of a decedent dying after the effective date of that act, either a gain or a loss on the outstanding installment sales obligations of his vendees, the profit from which sales he had been reporting on the installment basis, and as to which outstanding obligations no profit therein had been previously reported. The statute provides:

(d) *Gain or loss upon disposition of installment obligations.*—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the *basis of the obligation* and (1) in the case of satisfaction at other than face value or a sale or exchange—the amount realized, or (2) in case of a distribution, *transmission,* or disposition otherwise than by sale or exchange—*the fair market value of the obligation* at the time of such

distribution, *transmission,* or disposition. *The basis of the obligation* shall be the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full.

The respondent determined that under the provisions of the above statute, as interpreted by him in I.T. 2515 (IX–1 C.B. 125), there should be included in decedent's income for the period January 1 to December 10, 1928, a gain in the amount of $551,981.78. The respondent now concedes, as we interpret the stipulated facts, that the gain, if any, is the amount of $181,118.07.

The respondent in his ruling in I.T. 2515, *supra,* cites Committee on Finance Report No. 960, 70th Cong., 1st sess., p. 24, as supporting the interpretation he has placed upon section 44 (d), *supra.* This part of the Committee's report is as follows:

Subsection (d) contains new provisions of law to prevent evasion of taxes in connection with the transmission of installment obligations upon death, their distribution by way of liquidating or other dividends, or their disposition by way of gift, or in connection with similar transactions. The situations above specified ordinarily do not give rise to gain and yet at the same time it is urged that they permit the recipient to obtain a greatly increased basis in his hands for the property received, except in case of gifts. It therefore seems desirable to clarify the matter. The installment basis accords the taxpayer the privilege of deferring the reporting at the time of sale of the gain realized, until such time as the deferred cash payments are made. To prevent the evasion the subsection terminates the privilege of longer deferring the profit if the seller at any time transmits, distributes, or disposes of the installment obligations and compels the seller at that time to report the deferred profits. The sub-section also modifies the general rule provided in sub-section (a) for the ascertainment of the percentage of profit in the deferred payments, in those cases in which the obligations are satisfied at other than their face value or are sold or exchanged. The modification permits a compensating reduction in the percentage of profit in case the obligations are satisfied at less than their face value, or are sold or exchanged at less than face value.

Petitioners contend that section 44 (d), as construed by the respondent, is unconstitutional, in that it proposes to tax as " income " that which is not " income " within the Sixteenth Amendment, and that, in any event, it cannot apply to sales made prior to January 1, 1928. The term " income " has often been defined, *Eisner* v. *Macomber*, 252 U.S. 189, and need not be repeated here. As used in the Sixteenth Amendment, " income " includes gains derived by a taxpayer from an exchange of property, as well as gains realized in money, and the provisions in the revenue acts providing for the taxation of such gains are constitutional. *Atkins' Estate* v. *Lucas*, 36 Fed. (2d) 611.

We have already held in deciding the first issue that the agreement of February 10, 1923, constituted a contract of sale. The gain from such contract of sale comes within the Supreme Court's definition of income. The parties have stipulated that the maximum gross profit that could be realized from the agreement of sale when and

as executed, was $712,536.79, which is 47.502 percent of the agreed sales price. Sections 212 (d) and 1208 of the Revenue Act of 1926 granted the decedent the " privilege " of returning this gain on the installment basis, that is, on the basis that 47.502 percent of each payment of the sales price was income. On this basis, approximately $251,800 of the $712,536.79 was returnable as income up to the date of decedent's death. Congress intended by section 44 (d), *supra*, to terminate the " privilege of longer deferring the profit," but provided, however, that the deferred profit should be recomputed on the basis of the difference between the fair market value of the installment obligations remaining unpaid at the decedent's death and the " basis " of such obligations provided by law. The effect of section 44 (d) in the instant proceedings is to reduce the remaining deferred profit from approximately $460,700 ($712,536.79 minus $251,800) to $181,118.07. Since the latter amount is merely a part of the original gain, taxation on which was deferred because of the installment method of rendering income granted by the Government to the taxpayer as a privilege and not as a right, it follows that section 44 (d) cannot be held unconstitutional on the ground that the realization of gain provided for therein is not income within the Sixteenth Amendment. The gain involved in these proceedings would have all been taxable in the year 1923, assuming that the agreed deferred payments had a readily realizable fair market value, but for the fact that Congress has enacted legislation which permits the installment plan of returning income for taxation. Cf. *B. B. Todd, Inc.*, 1 B.T.A. 762; *Hoover-Bond Co.* v. *Denman*, 58 Fed. (2d) 909; *Willcuts* v. *Grodwohl*, 58 Fed. (2d) 587.

It remains only for us to consider petitioner's remaining contention that, in any event, section 44 (d) cannot apply to sales made prior to January 1, 1928, the effective date of Title I, which includes section 44 (d). See secs. 1 and 65, Revenue Act of 1928.

The decedent died on December 10, 1928, which was subsequent to the effective date of the statute here involved. On the date of his death he owned installment obligations of the fair market value of $666,213.30 (face value $957,026.94), as to which no profit had been reported. True, these obligations were from a sale made in the year 1923. But the statute does not require that the installment obligation which is transmitted by death be one resulting from a sale made subsequent to January 1, 1928. It plainly says: " If an installment obligation is * * * transmitted * * * gain or loss shall result * * *." The petitioners' contention on this point is denied.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

TRAMMELL and ADAMS dissent.