JOHN P. GAWLER AND ANNABEL C. GAWLER, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 6029–69—6034–69. Filed August 7, 1973.

*Leland T. Johnson* and *Bruce Hopkins*, for the petitioners. *John J. Weiler*, for the respondent.

[1] Proceedings of the following petitioners are consolidated herewith: Robert H. Myers and Antoinette H. Myers, docket No. 6030–69; Katherine L. Simmons, docket No. 6031–69; John H. Myers and Eleanor B. Myers, docket No. 6032–69; Berkeley L. Simmons, Jr., and Virginia T. Simmons, docket No. 6033–69; and Robert L. Simmons, docket No. 6034–69.

TANNENWALD, *Judge:* Respondent determined deficiencies in the income taxes of petitioners for the year 1965 in the following amounts:

| Docket No. | Petitioners | Deficiency | Addition to tax sec. 6651(a) |
|---|---|---|---|
| 6029–69 | John P. Gawler and Annabel C. Gawler | $11,977.66 | |
| 6030–69 | Robert H. Myers and Antoinette H. Myers | 6,071.43 | |
| 6031–69 | Katherine L. Simmons | 592.37 | $59.24 |
| 6032–69 | John H. Myers and Eleanor B. Myers | 983.20 | |
| 6033–69 | Berkeley L. Simmons, Jr., and Virginia T. Simmons | 1,339.79 | |
| 6034–69 | Robert L. Simmons | 595.38 | |

The sole question presented is whether losses attributable to petitioners' commitment of certain funds to the operation of the Compania Agricola Industrial Las Delicias Sugar Mill, a Costa Rican enterprise, in 1964 and 1965 are deductible as ordinary losses or capital losses.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulated facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Katherine L. Simmons, Robert L. Simmons, and John P. Gawler and Annabel C. Gawler, husband and wife, were legal residents of Washington, D.C., at the time they filed their petitions herein. Robert H. Myers, John H. Myers, and Berkeley L. Simmons, Jr., and their respective wives, Antoinette H. Myers, Eleanor B. Myers, and Virginia T. Simmons, were legal residents of Chevy Chase, Md., at the time they filed their petitions herein. All petitioners filed their 1965 Federal income tax returns, either jointly or individually,[2] with the district director of internal revenue, Baltimore, Md. For purposes of simplicity, petitioners will hereinafter sometimes be referred to as the Washington group.

Compania Agricola Industrial Las Delicias, S.A. (hereinafter referred to as Las Delicias or the corporation, was a Costa Rican corporation primarily engaged in the operation of a sugar mill in Costa Rica. On June 30, 1964, the corporation's shareholders of record, who were also creditors of the business, were as follows:

| Shareholders | Percent of stock | Loans to the corporation |
|---|---|---|
| Lucia Nielsen | 60 | $263,000 |
| Rolf Thyrre | 20 | 3,000 |
| Grant McCargo | 20 | 3,000 |

[2] All petitioners filed joint returns with their spouses except Katherine L. Simmons and Robert L. Simmons.

None of the shareholders of the corporation was related to any member of the Washington group.

In late 1962, the stockholders of the corporation (the Nielsen group) hired Jose A. Arias as general manager of the mill because of his extensive experience in sugar mill operations. When Arias came to the mill, it was not operating profitably. The sugar business is an unpredictable industry, and the normal problems which confront a sugar mill were compounded in the case of Las Delicias due to its lack of electrical power and the faulty, inadequate equipment it had in operation. Moreover, the corporation was experiencing excessive labor costs as a result of frequent work stoppages from machinery breakdowns and because of delays in the delivery of newly purchased equipment. Consequently, in the spring of 1964 there was some doubt about the continuance of the sugar mill's operations under the discouraging circumstances.

It was decided that the sugar mill would continue to operate only if its operations could be streamlined and made more efficient. Though the corporation clearly needed new funds for capital improvements, the members of the Nielsen group had committed substantial amounts to the business as loans and equity, and they felt the time had come to seek out new sources of capital. With this in mind, the Nielsen group dispatched Arias to the United States to search for new investment capital for the corporation. His initial efforts were largely unsuccessful, but during the course of his visit to the United States he had the occasion to speak of the sugar mill's difficulties with Robert H. Myers (Myers) and Robert L. Simmons (Simmons), two long-time friends.

At the time of the discussions with Myers and Simmons in spring of 1964, Arias had in his possession a study of the sugar mill's productive potential compiled by a Costa Rican consulting engineer, Senor Avram. The Avram study indicated that if the mill were modified, it could grind 300 tons of sugarcane per day, yielding between 150 and 160 pounds of sugar per ton. These production estimates, if met, would make the mill's operations profitable with a net profit of approximately $30,000 the first year. The study indicated that if the production estimates were maintained for a 3-year period and longer, within 3 years it would have a minimum net profit of $55,000 per year, after payments of all debts and a repayment of moneys loaned by Lucia Nielsen over a 10-year period. Finally, the study estimated the mill's additional capital requirements to be approximately $120,000.

Myers expressed some interest in placing funds with the corporation to improve its productive capacity, and he invited Arias to furnish him with additional information as to the monetary requirements for implementing Avram's modifications. Additionally, Myers and Simmons employed an engineer of their own to study the Las Delicias mill. The

engineer went to Costa Rica in May 1964 and reported back that the mill's operations could be made profitable with certain modifications.

Subsequently, Arias returned to the United States, in the early summer of 1964, and met again with Myers to review certain data prepared in Costa Rica by the company's accountant. The additional data discussed at the conference set out the estimated capital requirements needed to put the sugar mill into better production. On the basis of the information provided in the report by Arias and that of his independent consulting engineer, Myers concluded that it was possible for the Las Delicias mill to be made a profitable enterprise. He, therefore, told Arias he would investigate the possibility of locating individuals who might be interested in collectively committing funds to the sugar mill for the purpose of getting it into effective production.

As a result of Myers' efforts to interest various individuals in the sugar mill venture, he and Simmons soon were able to form the Washington group, which was composed of the petitioners herein and two other persons. All of the members of the group were personal friends, clients, or business associates of Myers, who became the spokesman for the group. No one in the group had ever been in the business of producing sugar.

In July 1964, Lucia Nielsen was in an automobile accident and was hospitalized in Boston, Mass. She was a Costa Rican citizen and the major shareholder and creditor of the corporation. Subsequent to her automobile accident, she became very interested in disposing of her entire commitment to the corporation, both debt and equity. Her primary concern, however, was to salvage the large loans she had made to the business. Accordingly, she related her wishes to her son, Edwin H. Neilsen (Neilsen), who, in his efforts to fulfill them, became the negotiator for his mother and the other shareholders.

The negotiations between the Nielsen group and the Washington group culminated in an agreement in which the Washington group agreed to contribute an undetermined amount of funds to the sugar mill and participate in its management. The agreement was never memorialized in a single document but instead was the result of exchanges of letters and memoranda between Myers and Nielsen. The negotiations went as follows.

On July 20, 1964, Myers sent Nielsen a letter which broadly set out the position of the Washington group in regard to their prospective participation in the business. Myers pointed out the risky nature of the undertaking and concluded that a minimum of $70,000 would have to be expended on the plant prior to the 1965 crop season to achieve a production of 60,500 bags of sugar. His conclusion was premised on a 6-month grinding season with a minimum of twenty-one 24-hour grinding days each month; on the processing of 300 tons of sugarcane

per grinding day with a yield of 160 pounds of sugar per ton; on certain minimum improvements to the production facilities; and on certain factors relating to the availability of raw sugarcane. The letter further expressed concern over the corporation's debt position, requested a detailed and accurate forecast of the business' cash requirements, and indicated that agreement with regard to the proper management of finances was a primary factor in the success of the prospective venture. Additionally, Myers concluded the Washington group would not participate in the corporation's profits "until a predetermined point at which it was reasonably certain that the venture would be successful." He also wanted the Washington group to assume financial control of the corporation and to have their own engineer present at the plant when the renovation took place.

Nielsen's response to Myers' letter, dated July 27, 1964, made known his mother's intention to sell her stock in the corporation and arrange for the liquidation of her loans. He further indicated that he expected a more concrete proposal from the Washington group. This letter was followed by a second letter from Nielsen, dated July 28, 1964, in which he emphasized that their negotiations must be resolved quickly if the modifications and repairs were to be completed before the 1965 crop season began. The second letter also indicated that the Nielsen group was negotiating with other parties who were interested in the mill.

The next step in the negotiations between Myers and Nielsen was verbal and transpired on or about August 14, 1964. Each individual prepared a memorandum for himself which set out the terms and conditions of his group. Myers' memorandum contained no production quota requirements, but provided, among other things, that none of their funds would be used to liquidate any debts due stockholders of the corporation; there would be a moratorium on capital payment to Lucia Nielsen until October 1967 with interest waived until then; the Washington group would control the corporation's finances and manage its operations; and that the Washington group would continue their monetary commitment to the mill until October 1965, at which time they would elect to (1) abandon the project, leaving in the business the capital invested to that point, or (2) receive 55 percent of the unissued stock and a prorated forfeiture of shares from the present stockholders so that they would own 55 percent of all outstanding stock in the corporation.[3]

Nielsen's corresponding position memorandum proposed, in part, that the Washington group would have financial control over the

[3] This included an option to the Washington group to buy one-half of Lucia Nielsen's stock in the mill at 75 percent of book value. It is not entirely clear from the evidence whether this provision meant one-half of Mrs. Nielsen's stock after petitioners obtained 55 percent of the outstanding stock, or was part of the deal to obtain such control.

mill's operations; that the Washington group provide sufficient funds to increase the mill's grinding capacity to 300 tons per day yielding 160 pounds of sugar per ton; that the Washington group take 12,250 shares of stock in the sugar mill in return for their investment; that the Washington group have the option to purchase one-half of Lucia Nielsen's stock at 75 percent of book value until October 1966, if the projected production quota was met; and that the Washington group would immediately supply Las Delicias with a bank draft for $10,000 to cover operating costs with the remaining funds to be supplied as soon as possible.

At this point neither of the two groups was satisfied with the offers made by the other. On August 18, 1964, Myers again composed a memorandum to himself which set out Nielsen's terms and the Washington group's objections and qualifications to them. The most important exceptions were that the Washington group was not interested in acquiring an equity interest in the corporation at the outset but that their objective was to invest in the plant operation and take their losses in the event the plant "does not so operate"; the funds committed to the corporation by the Washington group must not be used to liquidate the Nielsen group's loans to the corporation; the production quotas must be made more realistic; the moratorium on repayment of capital and loans to Lucia Nielsen must extend to October 1967 and include a waiver of dividends; and finally, that the Washington group's option to buy one-half of Lucia Nielsen's stock, assuming the production quota was met, must remain open from October 1966 until December 1967.

Myers then dispatched a letter to Nielsen, on August 19, 1964, in which he set out the Washington group's reaction to Nielsen's counterproposal. Included in his letter was a memorandum drawn from his personal notes composed the preceding day, and with essentially the same content. Myers stressed that this final proposal was the absolute best that he could do and that, if accepted, the Nielsen group should telegraph him no later than August 24. The key provisions of the memorandum read as follows:

On July 30, 1965, the Washington Group will:

1. Abandon the project, leaving in the business the capital invested to that point, or

2. Receive 55 percent of the stock outstanding at the time of issue without change in capital structure.

\* \* \* \* \* \* \*

The election of June 30, 1965, to be available to the Washington Group if either:

(a) The plant over a period of one month consisting of 20 grinding days grinds 300 tons a day yielding 150 pounds, or

(b) The plant produces over the grinding season 30,000 bags of sugar of 100 pounds.

The election of the alternative is reserved to the Washington Group.

On August 23, 1964, Nielsen telegraphed Myers his acceptance of the Washington group's final proposal, subject to minor modifications and clarifications. By letter bearing the same date, Nielsen forwarded to Myers a memorandum outlining the modifications indicated in the telegram, the most important of which dealt with the extent of the Washington group's financial control over the Las Delicias mill during their participation in the enterprise.

Upon receipt of Nielsen's letter, Myers telegraphed acceptance of the proposal modifications on August 25. Subsequently, on August 31, 1964, Myers notified Nielsen that $10,000 had been transferred to Las Delicias in Costa Rica on August 28.

The association between the Washington group and the Nielsen group existed for the duration of the 1965 crop season, with the former group investing a total of $105,000 in the mill's operations.

The Washington group's funds were recorded in the corporation's books as advances to guarantee option-to-buy shares. The bookkeeping procedure was set up at the corporate accountant's insistence, and no payment of any kind was made by the Nielsen group to the Washington group for their efforts to increase the mill's productivity.

At the outset of the 1965 crop season, Myers traveled to Costa Rica as representative of the Washington group to assess certain problems which arose in preparing the mill for operation. Upon his return to Washington, Myers had discussions with the members of the Washington group, and they decided to continue their financial support of the operation until the end of the 1965 grinding season. Additionally, during the 1965 grinding season, the group prepared periodic budgets and authorized Arias to expend specified amounts from the funds contributed. By June 30, 1965, however, the mill had not achieved the desired production quota, and the association was terminated.

Subsequent to June 1965, no member of the Washington group participated in any manner in the operation of the Las Delicias sugar mill.

Following the discontinuation of the venture, there were brief exchanges between the two parties in an attempt to negotiate a sale of the corporation. However, no sale was transacted, and the Washington group neither made any claim, nor received reimbursement, for the amounts they expended pursuant to their agreement with the Nielson group. Additionally, no member of the Washington group was held personally liable for any equipment purchased in connection with the mill during the course of the group's involvement with the corporation.

Of the $105,000 committed to the Las Delicias project by the Washington group, petitioners herein contributed the following amounts:

| Petitioners | Contribution | Petitioners | Contribution |
|---|---|---|---|
| John P. Gawler and Annabel C. Gawler | $24,000.00 | John H. Myers and Eleanor B. Myers | $6,000.00 |
| Robert H. Myers and Antoinette H. Myers | 24,000.00 | Berkeley L. Simmons, Jr., and Virginia T. Simmons | 6,372.29 |
| Katherine L. Simmons | 6,372.50 | Robert L. Simmons | 6,372.30 |

On their 1965 Federal income tax returns petitioners each claimed an ordinary-loss deduction for the amounts they had contributed to the venture.

In his notices of deficiency to the petitioners, respondent disallowed the deductions as ordinary losses and determined the losses were capital in nature.

OPINION

The parties are in agreement as to the amounts expended by petitioners and that their deduction, to the extent allowable, is governed by the provisions of section 165 [4] relating to losses, and not by section 162, relating to business expenses, or section 166, relating to bad debts. The single issue for decision is whether petitioners' losses are deductible in full as having been "incurred in [a] transaction entered into for profit" under section 165(c)(2) or whether they are deductible only as capital losses under section 165(f) because they are attributable to a failure to exercise an option to acquire a capital asset, i.e., stock in Las Delicias, within the meaning of section 1234 or because, under section 165(g), they were losses resulting from a worthless security, i.e., "a right to subscribe for, or to receive, a share of stock in a corporation [Las Delicias]."

It is crystal clear from the record herein that petitioners carefully sought to avoid the Scylla of section 1234 and the Charybdis of section 165(g). But the petitioners were entitled to try to navigate such a course and the mere presence of a tax-avoidance purpose is not enough to require us to put a stamp of "failure" on their efforts. Cf. *George L. Schultz*, 50 T.C. 688, 694 (1968), affirmed per curiam 420 F. 2d 490 (C.A. 3, 1970). Petitioners contend that, because the production quotas were never satisfied, they never had an option to acquire or the right to receive the Las Delicias stock and therefore neither section 1234 nor section 165(g) applies. Respondent takes a position directly opposed to that of petitioners, relying primarily on section 1234 and, alternatively, on section 165(g).

---

[4] All Code references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.

We deal first with respondent's alternative position, namely, the applicability of section 165(g).[5] Clearly, if the production quotas had been met, the petitioners would have had an unconditional right to receive 55 percent of the stock of Las Delicias. Had their investment thereafter become worthless, section 165(g) would have unquestionably applied, with the result that petitioners would have been limited to a deduction for a capital loss under section 165(f). Cf. *J. Meredith Siple*, 54 T.C. 1, 9 (1970). We do not think that the fact that petitioners' right to receive the Las Delicias stock was conditional should produce a different result. Certainly nothing in the statute requires that the "right to * * * receive" stock be unconditional.[6] An analogous question was presented in *James C. Hamrick*, 43 T.C. 21 (1964). There the taxpayer, upon the transfer of an invention to a corporation, received shares of stock plus the right to receive additional shares of stock if the future earnings of the corporation reached a specified level. Respondent contended that the right to receive the additional shares constituted "other property" under section 351 on which gain should be recognized. This Court, in rejecting that contention, held that the right to receive the additional shares represented additional equity ownership and that the contract, pursuant to which the corporation was formed, provided only for a stockholder interest. The same analysis represents the foundation of decision in *Carlberg* v. *United States*, 281 F. 2d 507 (C.A. 8, 1960), where a reorganization was involved. We think a similar rationale is applicable herein.

All of the cases relied upon by petitioners are distinguishable. In *Charles T. Parker*, 1 T.C. 709 (1943), and *Royal W. Irwin*, 37 B.T.A. 51 (1938), there was no corporation involved, so the question of a worthless security simply did not arise. *Harris W. Seed*, 52 T.C. 880 (1969), involved the difficult area of deductibility of expenditures connected with possible future business enterprises. There the tax-

---

[5] SEC. 165. LOSSES.

(g) WORTHLESS SECURITIES.—

(1) GENERAL RULE.—If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset.

(2) SECURITY DEFINED.—For purposes of this subsection, the term "security" means—

(A) a share of stock in a corporation;

(B) a right to subscribe for, or to receive, a share of stock in a corporation; or

(C) a bond, debenture, note, or certificate, or other evidence of indebtedness, issued by a corporation or by a government or political subdivision thereof, with interest coupons or in registered form.

[6] Nor is any such limitation indicated in the legislative history. Report on a Proposed Revision of the Revenue Laws, Ways and Means Subcommittee on Internal Revenue Taxation, 75th Cong., 3d Sess., pp. 44–46 (Jan. 14, 1938); H. Rept. No. 1860, 75th Cong., 3d Sess., pp. 18–19 (1938); S. Rept. No. 1567, 75th Cong., 3d Sess., pp. 13–14 (1938); H. Rept. No. 2330, 75th Cong., 3d Sess., p. 35 (1938)

payer's right to obtain stock was subject to further action *on his part;* namely, the furnishing of the cash necessary to pay for the shares. Here, at the time the claimed loss was sustained, no further cash was needed. The right to receive the shares of Las Delicias was totally independent of any further action on petitioner's part.

We hold that petitioners sustained capital losses by virtue of the limitations of section 165(f) and (g). In view of this conclusion, we find it unnecessary to delve into the unilateral versus bilateral concepts which permeate the cases involving the applicability of section 1234. Compare *United States Freight Company* v. *United States,* 422 F. 2d 887 (Ct. Cl. 1970); *Malden Knitting Mills,* 42 T.C. 769, 777 (1964); *Morris R. DeWoskin,* 35 T.C. 356 (1960); *W. A. Drake, Inc.,* 3 T.C. 33 (1944), affd. 145 F. 2d 365 (C.A. 10, 1944).

Reviewed by the Court.

*Decisions will be entered for the respondent.*

STERRETT, *J.,* did not participate in the consideration and disposition of this case.

GOFFE, *J.,* concurring: I concur both in the result reached by the majority and in the line of reasoning employed to reach that result. In addition, I would hold for respondent on the grounds that the advances to Las Delicias do not constitute transactions entered into for profit under the provisions of section 165(c)(2).

I find no authority for the proposition that the acquisition of corporate stock, per se, constitutes a transaction entered into for profit and I conclude that the rule must be that it is not such a transaction. The profit hoped to be derived is either dividend income or gain from the subsequent sale or other disposition of the stock. The payment of dividends is another transaction as would be the subsequent sale or other disposition of the stock. Petitioners could not hope to reap any profits by making the advances to Las Delicias. They could only reap the reward of being a stockholder if all of the required conditions transpired. Obviously this characterized the advances as capital in nature. Petitioners do not contend that the advances are deductible as bad debts.

In *Charles T. Parker,* 1 T.C. 709 (1943), the advances by the taxpayer were for the purpose of sharing in a mining venture and we held that this was a transaction entered into for profit.

The issue in *Harris W. Seed,* 52 T.C. 880 (1969), was whether the taxpayers' expenditures represented the cost of investigating a business opportunity or, because of the point at which the venture had progressed, represented a transaction entered into for profit. The parties in that case stipulated that the expenditures were for the purpose of thereafter realizing a profit. I conclude, therefore, that *Harris W. Seed,*

*supra*, does not stand for the proposition that expenditures in promoting a business venture whereby the venturer will receive only corporate stock represent entering into a transaction for profit.

I, therefore, concur in order to reflect my view that no concession should be made in the instant case that petitioners had entered into a transaction for profit under the provisions of section 165(c)(2).

---

DRENNEN, *J.*, dissenting: I respectfully dissent for the following reasons. As stated by the majority, there remains for decision only the question whether the losses incurred by petitioners are ordinary or capital in nature.

Section 165(a) provides generally a deduction for losses sustained during the taxable years and not compensated for by insurance or otherwise. The deduction provided in subsection (a) is limited, however, in the case of individuals, by subsection (c), to (1) losses incurred in a trade or business, or (2) losses incurred in a transaction entered into for profit though not connected with a trade or business, and (3) casualty losses. Such losses are deductible in full unless limited by some other provision of the Code. Subsection (f) does limit the deduction for losses from sales or exchanges of capital assets to that allowed in sections 1211 and 1212. Also subsection (g) provides that if a security, as therein defined, which is a capital asset becomes worthless during the taxable year the loss resulting therefrom will be treated as a loss from the sale or exchange of a capital asset. And finally section 1234 provides that a loss attributable to the sale or exchange of, or from the failure to exercise, a privilege or option to buy or sell property shall be considered a loss from the sale or exchange of property which has the same character as the property to which the option or privilege relates.

It is within the above statutory framework that we must decide the issue before us. Petitioners contend that the losses they admittedly incurred in 1965 were losses incurred in a transaction entered into for profit, deductible in full, and that none of the other provisions which would require treatment of those losses as capital losses are applicable. Respondent, on the other hand, contends that the losses were attributable to petitioners' failure to exercise a privilege or option to acquire stock in Las Delicias or their failure to perform a unilateral contract, either of which he claims would result in capital loss treatment under section 1234; or in the alternative, that the losses resulted from a security which became worthless which would be deductible as a loss on the sale or exchange of a capital asset under section 165(g).

There can be little question that petitioners' losses were incurred in a transaction entered into for profit, in one way or another. Re-

spondent makes a rather feeble argument that petitioners did not expect to make their profit from renovating the sugar mill but rather from acquiring stock in the corporation. I find this argument to be inapposite for petitioners were obviously interested in making money and whether they achieved their goal through a capital transaction or a noncapital transaction is completely irrelevant for purposes of section 165(c)(2). The evidence is quite clear that had the transaction run its intended course petitioners would have become the controlling stockholders of a profitable sugar mill operation from which they expected to make a profit. Plainly this brings them within the provisions of 165(c)(2) and consequently 165(a). We are thus left with the question of whether the losses were attributable to a failure to exercise an option, so that section 1234 would be controlling, or resulted from a security becoming worthless within the meaning of section 165(g).

Respondent's principal contention is that under the somewhat nebulous agreement between the parties, petitioners were given the option to meet the production standards demanded by the Nielsen group and if they did so, they were entitled to 55 percent of the stock of Las Delicias; and that the election to take the stock after the production quotas had been met was illusory and nothing more than a formality. Contrarily, petitioners contend that they were obligated under the agreement to try to meet the production quotas and until they did so they had no option at all. While it is quite probable that had the production quotas been met petitioners would have taken the stock, this cannot be said to be a foregone conclusion and hence a mere formality. On the other hand, the entire agreement failed to give petitioners any rights which would qualify as an option that would warrant capital gains treatment under section 1234 unless and until they met the production quotas.

Like the majority, I am reluctant to delve into the unilateral versus bilateral concepts that permeate some of the cases involving the applicability of section 1234 because it is difficult for me to fit a unilateral agreement into the statutory language of section 1234 unless it is tantamount to an option. Nevertheless, respondent presses the argument and in light of the conclusion I reach I feel I should discuss it.

The record clearly discloses that the agreement between the Washington group and the Nielsen group imposes duties on both parties. The Nielsen group was anxious to make the mill profitable and thereby regain their funds invested in the business principally as loans but also as capital. Furthermore, they believed it was necessary that the mill be revitalized in the 1965 cutting and grinding season or all would be lost. Given these considerations, certainly they would not have given

the Washington group carte blanche to undertake the renovation of the sugar mill without some commitment on the part of the Washington group that it would make a bona fide attempt to make the operation successful. I think petitioners' obligation was rather explicit in the exchange of correspondence and the conversations upon which the agreement was consummated, and was also inherent in the form in which the arrangements were cast. The fact that the Nielsen group apparently had other groups interested in making advances to the sugar mill also indicates that it exacted some promise from petitioners, for, being reasonable businessmen, the members of the group clearly would have wanted some commitment from petitioners before abandoning their other alternatives. Another aspect of the transaction which confirms the bilateral nature of the agreement is the protracted negotiations between the parties in which the Nielsen group was obviously attempting to maximize the commitment of the Washington group. The Nielsen group was successful to the extent of a $105,000 contribution which was unrefundable. Finally, I think that the Washington group was quite aware of its obligation as indicated by its continued support of the sugar mill operation during the entire 1965 cutting and grinding season despite the unfavorable report brought back from Costa Rica by Myers in January 1965, only halfway through the season.

For these reasons I am unable to find that the agreement between the Washington group and the Nielsen group was unilateral, as respondent urges us to do. Therefore, the line of cases relied upon by respondent such as *Lawler* v. *Commissioner*, 78 F. 2d 567 (C.A. 9, 1935), reversing sub nom. *Estate of Erskine M. Ross*, 29 B.T.A. 227 (1933); *W. A. Drake, Inc.*, 3 T.C. 33 (1944), affd. 145 F. 2d 365 (C.A. 10, 1944); and *Morris R. DeWoskin*, 35 T.C. 356 (1960), which appear to recognize that unilateral agreements are transactions which fall within the ambit of section 1234, are not controlling.

Nor can I find that petitioners had an option within the meaning of section 1234 under any other standard. In normal parlance an option is something which the optionee has the right to exercise at or during the times prescribed in the option. Here petitioners were never in a position to exercise any option because they were unable to meet the production quotas, and even had the quotas been met, exercise of the option was not a foregone conclusion. Petitioners' failure to meet the production quotas therefore does not equate with a failure to exercise an option.

Petitioners had no unqualified contract right to a capital asset as a result of their agreement with the Nielsen group. Section 1234, as do all of the capital gains and loss provisions, plainly contemplates the existence of a capital asset which normally can be bought or sold. Peti-

tioners have never had anything they could buy or sell. They were not entitled to an interest in the company unless they first met the production quotas; nor had they any apparent right to sell or assign the opportunity to try to achieve those quotas and thus become entitled to an interest in the company.

Moreover, my interpretation of the evidence convinces me that though the remuneration for petitioners' undertaking was to be a capital asset, i.e., 55-percent ownership in Las Delicias, the basic tenor of the transaction was not capital but ordinary. I believe petitioners undertook to get the Las Delicias sugar mill on its feet contributing their money and financial management skills in return for the promised stock if they were successful. It was a deal wherein they would render a performance which, if successful, would entitle them to a capital asset in lieu of some other type of remuneration. In short, they clearly set out to acquire controlling ownership of the plant, a capital asset, but the means they chose to expedite their plan did not take the form of a capital transaction. Additionally, it is quite possible that had the venture succeeded and petitioners received the stock, they might have been subject to income tax on the difference between their advances and the fair market value of the stock, as ordinary income.

Admittedly, this was an unusual and extraordinarily aleatory-type arrangement where petitioners were willing to risk their own capital in someone else's business upon the contingency that until the operations were made successful they would get no return on their contributions. Petitioners undoubtedly had reasons of their own for fashioning the arrangements in this manner, which quite likely included consideration of the U.S. tax structure and the Costa Rican corporation and labor laws. But, unusual as it may be, the fact remains that here petitioners did not possess anything which could be considered a capital asset under the Internal Revenue Code.

Because of the uncommon nature of petitioners' agreement with the Nielsen group, I have found very few cases factually similar which direct the way to the correct characterization of these losses. While primarily concerned with whether the expenditures there involved were made in a transaction or a mere investigation, I find the cases of *Harris W. Seed*, 52 T.C. 880 (1969), and *Charles T. Parker*, 1 T.C. 709 (1943), helpful to some degree. In those cases as here a successful conclusion of the ventures would have resulted in taxpayers acquiring capital assets, but the ventures failed and the capital assets were never acquired. Nevertheless, this did not prevent this Court from recognizing that the losses were incurred in transactions entered into for profit and consequently deductible in full. The Commissioner acquiesced in the *Parker* case and subsequently issued Rev. Rul. 57–418,

1957–2 C.B. 143, explaining his position, which supports the conclusion I would reach here. The revenue ruling—

held that a loss * * * sustained during a taxable year with respect to expenditures incurred in search of a business or investment is deductible only where the activities are more than investigatory and the taxpayer has actually entered into a transaction for profit and the project is later abandoned. The loss is allowable [under section 165(c)(2)] only in the taxable year in which the project is abandoned.

There can be no question that petitioners had actually entered into a transaction for profit here.

The majority opinion bases its conclusion on respondent's alternative argument that petitioners' losses must be treated as capital losses because of section 165(g). Under that section, if a security *which is a capital asset* becomes worthless, the loss resulting therefrom is treated as a capital loss. The definition of a "security" for purposes of that section includes "a right to subscribe for, or to receive, a share of stock in a corporation." Respondent argues and the majority concludes that because petitioners would have had a right to receive stock of the corporation if their attempt to meet the production quotas had been successful, this somehow gave them a security within the meaning of section 165(g). The conclusion of the majority is based on the assumption that petitioners had a right to receive stock. However, the argument defeats itself since petitioners never had a right to subscribe for or right to receive stock due to their failure to meet the production quotas.

In *James C. Hamrick*, 43 T.C. 21 (1964), cited by the majority, the two inventors transferred all of their interest in their patent to a newly formed corporation in exchange for 190 shares each of the corporation's stock and the right to have issued to them by the corporation additional shares of stock when the net earnings of the corporation exceeded 10 percent of the par value of the outstanding and issued capital stock. This was stated to be the consideration for the assignment and agreement in the written assignment agreement. There the right to receive additional stock was a contract right that came into existence when the assignment was made. That it was considered an existing asset freely transferable is evidenced by the fact that one of the inventors did sell both his stock and his right to receive additional shares of stock; and by the fact that the directors of the corporation later found it necessary to first acquire the rights and then retire them rather than simply to retire the rights, in order to resolve a conflict between the stockholders. Likewise, in *Carlberg* v. *United States*, 281 F. 2d 507 (C.A. 8, 1960), also cited by the majority, the rights there

involved were evidenced by certificates of contingent interest in certain reserved shares of stock.

The above two cases are the only cases cited by the majority as support for its conclusion that the "right to receive" stock, as used in the definition in section 165(g), need not be unconditional. Of course, those two cases involved entirely different provisions of the Code but in my opinion they do emphasize that a security, or right to receive stock, which can be classified as a capital asset as required by section 165(g), must be something in hand that can be transferred for a consideration. In this case the petitioners never had anything in hand that they could have transferred, and hence in my opinion they did not have a security within the meaning of section 165(g).

The statement made in the majority opinion in attempting to distinguish *Harris W. Seed, supra*, points up the fallacy in the reasoning which I believe leads to the majority's erroneous conclusion in this case. In referring to *Seed* the majority says—

There the taxpayer's right to obtain stock was subject to further action *on his part*, namely, the furnishing of the cash necessary to pay for the shares. Here, at the time the claimed loss was sustained, no further cash was needed. The right to receive the shares of Las Delicias was totally independent of any further action on petitioners' part.

I submit that this reflects a clear misunderstanding of the situation. Petitioners' right to receive the shares of Las Delicias was at all times dependent on action or further action on their part. Having failed to perform as required by the agreement and having decided to take no further action, petitioners never acquired the right to receive stock. The attempted distinction of *Seed* is not valid.

My conclusion is bolstered, I believe, by analysis of the character and posture of subsection (g) in section 165. Subsection (g) itself does not limit the amount of the loss allowable. It simply treats the loss from a security which is a capital asset becoming worthless as a loss from the sale or exchange of a capital asset. One must turn to the preceding subsection (f) to determine the effect of this treatment. Subsection (f) limits the losses from *sales* or *exchanges* of *capital assets*. If the "right to receive" stock cannot be sold or exchanged, it would not seem to have any place in subsection (g).

Furthermore, if one analyzes the meaning of "right to receive" in the context of the entire paragraph (2)[1] in which it appears, it becomes clear that what is intended to qualify as a "security" under subsection

---

[1] (2) SECURITY DEFINED.—For purposes of this subsection, the term "security" means—

(A) a share of stock in a corporation;

(B) a right to subscribe for, or to receive, a share of stock in a corporation; or

(C) a bond, debenture, note, or certificate, or other evidence of indebtedness, issued by a corporation or by a government or political subdivision thereof, with interest coupons or in registered form.

(g) is a specific documented and existing right, probably one issued by the corporation itself, such as stock warrants and stock rights. Definition (A) refers to a share of stock in a corporation, which is tangible evidence of an interest in the corporation. Definition (C) refers to a bond, debenture, note, or certificate, or other evidence of indebtedness, issued by a corporation. Definition (B) refers to "a right to subscribe for, or to receive, a share of stock in a corporation." A right to subscribe for stock in a corporation is a tangible right issued by the corporation itself. It is only reasonable to believe that Congress had reference to the same sort of corporate issue when it included the words "or to receive" in this sentence of the definition. If this analysis holds water, then I do not believe petitioners held a "security" the becoming worthless of which produced their losses.

Viewing the transaction as a whole, I cannot find that petitioners' losses resulted from or were attributable to the sale or exchange of capital assets as defined in any of the provisions of the Internal Revenue Code brought to our attention. Since I read section 165 (a) and (c) to be inclusive, except for statutory exceptions, I believe that any deductible loss not limited by the other provisions of the Code shall be deductible in full as an ordinary loss. There is agreement between the parties that the losses are deductible and it, therefore, follows that the losses suffered by petitioners in 1965 were losses incurred in a transaction entered into for profit deductible in full in that year under section 165 (c) (2).

DAWSON, FAY, and FEATHERSTON, *JJ.*, agree with this dissent.

WILES, *J.*, dissenting: I agree with the conclusion in Judge Drennen's dissent that the entire agreement failed to give petitioners an option to acquire or the right to receive the stock. In my opinion, however, it is unnecessary to find that the agreement was bilateral in order to reach this conclusion.